1
2
3
4
5
6
7              UNITED STATES DISTRICT COURT
8              EASTERN DISTRICT OF CALIFORNIA
9
10   MARK MUNNS, et al.,              No. 2:10-cv-00681-MCE-EFB
11          Plaintiffs,
12      v.                           MEMORANDUM AND ORDER
13   HILLARY DIANE RODHAM CLINTON,
     et al.,
14
            Defendants.
15
16                  ----oo0oo----
17      Plaintiffs Mark Munns and Christa Munns (acting as administrators
18   of the estate of Joshua Munns), Dennis DeBrabander and Sharon
19   DeBrabander (acting as administrators of the estate of John
20   Young), and Lori Silveri (acting as administrator of the estate of
21   John Cote) (collectively "Plaintiffs") initiated this action
22   against Defendants Hillary Diane Rodham Clinton, individually and
23   in her official capacity as United States Secretary of State
24   (hereafter "Clinton" or "Secretary"), and Jennifer Foo,
25   individually and in her official capacity as an employee of the
26   Office of the Secretary of State (hereafter "Foo"), (collectively
27   "Defendants") alleging causes of action arising out of the deaths
28   of Joshua Munns, John Young and John Cote ("Decedents").

                              1

1   Presently before the Court are Defendants' Motions to Dismiss

2   (ECF Nos. 19 and 21) all of Plaintiffs' claims against them in

3   both their individual and official capacities.  Also before the

4   Court are an Objection and Motion to Strike Defendants' Motions

5   to Dismiss (ECF No. 37) and a Request for Judicial Notice (ECF

6   No. 38) filed by Plaintiffs.  Defendants' Motions came on for

7   hearing before the Court on June 23, 2011, at 2:00 p.m.  For the

8   following reasons, Defendants' Motions are GRANTED with leave to

9   amend.  Plaintiffs' Objection and Motion to Strike and Request

10  for Judicial Notice are DENIED.

11

12                          **BACKGROUND**[1]

13

14       Plaintiffs are the families of three men, Joshua Munns, John

15  Young and John Cote, who were killed in Iraq in 2008

16  ("Decedents").  Decedents were employed by a private contractor,

17  Crescent Security ("Crescent"), that performed security functions

18  under contract with the United States Government.[2]  The events

19  underlying the Complaint were triggered when Crescent assigned

20  Decedents and four other men to guard a one and one-half mile

21  long military convoy traveling from Kuwait to Southern Iraq.

22  ─────────────────

23       [1] The following facts are derived from Plaintiffs'
    Complaint.

24       [2] Plaintiffs sued Crescent in a related case, <u>Munns v.</u>

25  <u>Crescent Security Group, Inc., et al.</u>, 2:09-cv-00981-MCE-EFB.
    While it appears from that docket that Plaintiffs have never

26  served any of those defendants or in any other way actively
    pursued prosecution of that action, Plaintiffs' counsel clarified

27  at oral argument that Plaintiffs have in fact spent thousands of
    dollars and a significant amount of time in attempting to locate

28  Crescent's principal, who is believed to be somewhere in the
    Middle East, but who has, to date, alluded Plaintiffs' efforts.

According to Plaintiffs, Crescent issued the men substandard equipment, ordered another security team that was supposed to assist in the duty to stand down, and failed to provide the men proper instructions or job guidelines.  In addition, Iraqi security team members, who were also Crescent employees, failed to appear for the assignment, leaving only the seven men to guard the convoy.

While under Decedents' guard, the convoy stopped at an Iraqi checkpoint.  After three to five minutes of waiting, a white pickup truck approached and shot at the rear vehicle, which was not occupied by any of the Decedents.  Decedents themselves, however, were also stopped by Iraqi men in police uniforms.  They were stripped of their communications gear and weapons, bound and forced into the backs of different vehicles.  Plaintiffs allege one of the Iraqi officers was a former Crescent employee and that Crescent's Iraqi interpreter was also working with the group orchestrating the hijacking.

When the Iraqi men eventually received a phone call notifying them that the United States military was en route, the men packed up and left with Decedents as captives.  Other individuals were left behind and were able to relay the aforementioned facts.  Plaintiffs have since been told, among other things, that the kidnapping took place in full view of the United States military, but that the Government did nothing to intercede.

///

///

///

3

1    According to Plaintiffs, from this point forward, "federal
2  officials who were assigned to assist the families while they
3  sought the return of their adult children, such as Defendant
4  Jennifer Foo, actually worked to impede the families' work and
5  created 'government policies' to block their efforts to save
6  their sons." Complaint, p. 7, ¶ 7. Members of the State
7  Department, including Defendant Foo, also allegedly: 1) failed or
8  refused to relay information to Plaintiffs; 2) advised members of
9  the families they should not meet with an individual who had
10  reportedly obtained information on the location and condition of
11  the missing men; 3) refused to distribute or blocked the
12  distribution of leaflets asking for information about the
13  hostages; 4) told families the FBI was pursuing leads that would
14  not be described; and 5) claimed to have relevant information
15  that could not be relayed to Plaintiffs because it was
16  "classified."

17    More specifically, Plaintiffs allege, among other things,
18  that they had collected funds and prepared 90,000 flyers (printed
19  in English and Iraqi) for distribution in the Middle East. These
20  flyers offered a reward for information pertaining to the missing
21  men, but the State Department blocked their distribution.

22    In addition, though Plaintiffs were provided with audio and
23  video "proofs of life," the United States refused to make contact
24  with the kidnappers under the policy that "America does not
25  negotiate with terrorists." Plaintiffs dispute whether the
26  United States actually considers the kidnappers in this case to
27  be "terrorists" or simply considers them "common criminals."
28  ///

1    After the families saw little progress in either the
2  location or rescue efforts, the United States Drug Enforcement
3  Administration ("DEA") interceded in the matter on behalf of a
4  DEA employee who was a family member of one of the missing men.
5  The DEA determined that the kidnappers had given up trying to
6  negotiate with the United States because the kidnappers believed
7  they had no "negotiating partner."  As an apparent last resort,
8  the kidnappers eventually cut off one of each Decedents' fingers,
9  later obtained by the DEA, and still the United States would not
10 negotiate.  Decedents were thereafter brutally beaten, tortured
11 and beheaded.  Only then, after their deaths, did the United
12 States finally negotiate for the return of Decedents' bodies.

13    Plaintiffs contend that, throughout this ordeal, they were
14 provided very little information by either the United States
15 Government or Crescent.  Plaintiffs still have not been given
16 employment contracts, life insurance information or other related
17 employment documents.  In addition, Plaintiffs allege Crescent
18 has improperly withheld life insurance benefits that are due the
19 families and has required the families to sign releases of
20 liability in order to receive those funds.  Plaintiffs believe
21 they are entitled to these life insurance proceeds and
22 potentially to back pay due the kidnapped men.  According to
23 Plaintiffs, the Secretary, for her part, has "refused to provide,
24 or was incapable of providing, even the most basic information,
25 such as copies of Crescent Security contracts, Lloyd's of London
26 life insurance information" or other documents.  Id., p. 11,
27 ¶ 17.
28 ///

1     In light of the lack of information received from the
2  Government, Plaintiffs have purportedly had to rely on third
3  parties for information.  For example, Plaintiffs allege they
4  heard rumors that the kidnapping may have been motivated by
5  revenge for incidents that occurred as a result of the passage of
6  the Coalition Provision Authority ("CPA") Order 17, which is
7  allegedly a State Department regulation creating absolute
8  immunity for private contractors killing anyone in Iraq.
9  Plaintiffs also garnered information from the book "Big Boy
10 Rules, America's Mercenaries Fighting in Iraq," by Steve Fainaru.

11     Ultimately, as a result of the above events, Plaintiffs
12 initiated this suit alleging causes of action for: 1) declaratory
13 relief; 2) Procedural Due Process Clause violations; and
14 3) violations of the Takings Clause of the United States
15 Constitution.  Plaintiffs seek damages and injunctive relief and
16 ask the Court to make the following declarations:

17     Whether CPA (Coalition Provision Authority) Order 17,
       was and is a proper application of government authority
18     under the United States Constitution when it provided
       for a complete waiver of all laws, including those of
19     Iraq and those enacted by the United States Congress.
       Complaint, p. 15, ¶ 26(a).
20
       Whether as a consequence of CPA Order 17, Iraq became a
21     "free fire zone" where contractors were allowed to shot
       [*sic*] at anything with complete impunity t [*sic*]
22     whenever they felt, in their sole discretion,
       physically threatened.  Id., p. 16, ¶ 26(b).
23
       Whether CPA Order 17 gave rise to and helped foster the
24     contractor and subcontractor culture in Iraq, where
       companies like Crescent literally sprang up overnight
25     and were nothing more than a folding table, some
       stationary, and a couple beat-up trucks with AK-47
26     machine guns, but sanctioned to do business on behalf
       of the United States and listed by the Secretary of
27     State and Department of Defense as legitimate business
       entities.  Id., p. 16, ¶ 26(c).
28

Whether the numbers and statistics have been so skewed throughout the Iraq conflict that no one in the Office of the Secretary State can really tell Plaintiffs how much money we spent and how many contractors employed by the United States have been lost; in essence, who is doing the fighting for the United States.  <u>Id.</u>, p. 16, ¶ 26(d).

[W]hat the parameters are of the "War on Terror" and who exactly the United Stats [*sic*] is fighting.  <u>Id.</u>, p. 17, ¶ 26(e).

[H]ow far federal immunity extends to a private contractor like Crescent or an American Citizen who is recruited and serves in this war under a private contract that is let through the Secretary of State. Further, what inalienable Constitutional rights are lost or given up by a private citizen, such as the Plaintiffs' sons, when he or she executes such a contract and whether it is a public document that should be made available to the families of those citizens and the public?  Id., p. 17, ¶ 26(f).

Within the "War on Terror" how far does a family's Constitutional and Due Process Rights extend?  Id., p. 17, ¶ 26(g).

Whether the families of contractors were legally prohibited from negotiating with the kidnappers, who were referred to by President as "common criminals" - in other words, not "terrorists," and what are the origins of this "official policy," and why did it not apply to similarly situated Iraqis.  Whether there is an official policy in the United States government that "we do not negotiate with terrorists."  Id., p. 17, ¶ 26(h).

What recovery may be made by a family or surviving spouse of a private contractor employed in the 'War on Terror?'  And how does one recover under the employment contracts that no one has ever seen, or receive life insurance benefits taken out by the companies in the names of the contractors without anyone's knowledge?"  Id., p. 18, ¶ 26(i).

///

///

///

///

///

7

1    Defendants moved to dismiss on March 7, 2011, arguing as to
2 the Plaintiffs' Complaint against Defendants in their official
3 capacities that: 1) Plaintiffs' claims raise nonjusticiable
4 political questions; 2) Plaintiffs lack standing to seek a
5 declaration or an injunction because they have failed to allege
6 an imminent future injury; 3) Plaintiffs have likewise failed to
7 satisfy the preconditions for injunctive and declaratory relief
8 because they have not alleged a likelihood of future injury;
9 4) the Court should decline to exercise its discretion to issue
10 injunctive or declaratory relief; 5) sovereign immunity bars
11 Plaintiffs' claims for compensation; 6) Plaintiffs failed to
12 state a claim under the Takings Clause; and 7) Plaintiffs failed
13 to properly serve Defendants.  Defendants also challenged
14 Plaintiffs' claims against them in their individual capacities
15 arguing that: 1) Plaintiffs' claims raise nonjusticiable
16 political questions; 2) this Court lacks personal jurisdiction
17 over the individual-capacity Defendants; 3) venue is improper in
18 this Court; 4) Plaintiffs have failed to properly serve
19 Defendants; 5) Plaintiffs lack a cause of action against
20 Defendants; 6) qualified immunity bars Plaintiffs' claims; and
21 7) Plaintiffs' claims for an injunction and declaratory relief
22 are improper.

23    Plaintiffs opposed Defendants' Motions on April 28, 2011,
24 and Defendants replied on May 12, 2011.  In their Oppositions,
25 Plaintiffs argue that, in addition to their above expressly
26 identified causes of action, they have also alleged sufficient
27 facts within their Complaint to state a cause of action under the
28 First Amendment.

Plaintiffs also subsequently filed an Objection and Motion to Strike and a Request for Judicial Notice.  For the following reasons, Defendants' Motions are GRANTED with leave to amend. Plaintiffs' Requests are DENIED.

**ANALYSIS**

**A.   The Political Question Doctrine**

Defendants first move to dismiss Plaintiffs' Complaint in its entirety on the basis that each of Plaintiffs' claims present nonjusticiable political questions.  Despite the persuasiveness of Defendants' position on its face, this Court accepts their argument only in part.

**1.   Standard governing a motion to dismiss pursuant to the political question doctrine.**

"[I]f a case presents a political question, [the Court] lack[s] subject matter jurisdiction to decide that question." Corrie v. Caterpillar, Inc., 503 F.3d 974, 982 (9th Cir. 2007). Federal Courts are presumptively without jurisdiction over civil actions, and the burden of establishing the contrary rests upon the party asserting jurisdiction.  Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994).  Lack of subject matter jurisdiction is never waived and may be raised by either party or the Court at any time.  Attorneys Trust v. Videotape Computer Prod., Inc., 93 F.3d 593, 594-95 (9th Cir. 1996).

///

9

1   In moving to dismiss for lack of subject matter jurisdiction

2  pursuant to Federal Rule of Civil Procedure 12(b)(1),[3] the

3  challenging party may either make a facial attack on the

4  allegations of jurisdiction contained in the complaint or can

5  instead take issue with subject matter jurisdiction on a factual

6  basis.  Thornhill Publ'g Co. v. Gen. Tel. & Elect. Corp.,

7  594 F.2d 730, 733 (9th Cir. 1979); Mortensen v. First Fed. Sav. &

8  Loan Ass'n, 549 F.2d 884, 891 (3rd Cir. 1977).  If the motion

9  constitutes a facial attack, the Court must consider the factual

10  allegations of the complaint to be true.  Williamson v. Tucker,

11  645 F.2d 404, 412 (5th Cir. 1981); Mortensen, 549 F.2d at 891.

12  If the motion constitutes a factual attack, however, "no

13  presumptive truthfulness attaches to plaintiff's allegations, and

14  the existence of disputed material facts will not preclude the

15  trial court from evaluating for itself the merits of

16  jurisdictional claims."  Thornhill, 594 F.2d at 733 (quoting

17  Mortensen, 549 F.2d at 891).  The court may properly consider

18  extrinsic evidence in making that determination.  Velasco v.

19  Gov't of Indon., 370 F.3d 392, 398 (4th Cir. 2004).  Defendants

20  here facially attack Plaintiffs' Complaint.

21   A court granting a motion to dismiss a complaint must decide

22  whether to grant leave to amend.[4]

23  ///

24

---

25   [3] All further references to "Rule" or "Rules" are to the
26  Federal Rules of Civil Procedure unless otherwise noted.

27   [4] The Court only articulates the standard governing leave to
   amend once here, with reference to the instant discussion.  This
28  same standard, however, is relied upon by the Court, as relevant,
   throughout this Order.

Leave to amend should be "freely given" where there is no "undue delay, bad faith or dilatory motive on the part of the movant,...undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment...." Foman v. Davis, 371 U.S. 178, 182 (1962); Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to be considered when deciding whether to grant leave to amend). Not all of these factors merit equal weight. Rather, "the consideration of prejudice to the opposing party...carries the greatest weight." Eminence Capital, 316 F.3d at 1052 (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 185 (9th Cir. 1987)). Dismissal without leave to amend is proper only if it is clear that "the complaint could not be saved by any amendment." Intri-Plex Techs. v. Crest Group, Inc., 499 F.3d 1048, 1056 (9th Cir. 2007) (internal citations and quotations omitted).

## 2.   The political question analysis.

"The political question doctrine is an important tenet of separation of powers and judicial restraint. But the doctrine is notorious for its imprecision, and the Supreme Court has relied on it only occasionally...'That the contours of the doctrine are murky and unsettled is shown by the lack of consensus about its meaning among the Supreme Court and among scholars.'" Harbury v. Hayden, 522 F.3d 413, 418 (D.C. Cir. 2008) (quoting Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 803 n.8 (D.C. Cir. 1984) (Bork, J. Concurring) (citations omitted)).

Indeed, "[a]lthough the political question doctrine often lurks in the shadows of cases involving foreign relations, it is infrequently addressed head on." Alperin v. Vatican Bank, 410 F.3d 532, 538 (9th Cir. 2005). Nonetheless, "'[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.'" Id. at 544 (quoting Marbury v. Madison, 5 U.S. (1) Cranch) 137, 170 (1803)).

"In the landmark case of Baker v. Carr, the Supreme Court provided its most comprehensive discussion of the application of the doctrine. Recognizing that the attributes of the political question doctrine 'diverge, combine, appear, and disappear in seeming disorderliness' in various settings, the Court set out to illuminate the 'contours' of the doctrine." Id. (quoting Baker v. Carr, 369 U.S. 186, 210-11 (1962)). The Court thus set forth six factors for consideration in determining whether resolution of a case should be deferred to the political branches. Id. Namely, the Baker Court opined that:

> [p]rominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

///

///

369 U.S. at 217.  "Dismissal on the basis of the political
question doctrine is appropriate only if one of these
formulations is 'inextricable' from the case."  Alperin, 410 F.3d
at 544.

The Baker Court cautioned, however, "against 'sweeping
statements' that imply all questions involving foreign affairs
are political ones."  Id. at 544-45 (quoting Baker, 369 U.S. at
211).  "Instead, the Court instructed that courts should
undertake a discriminating case-by-case analysis to determine
whether the question posed lies beyond judicial cognizance."  Id.
at 545.  "Nevertheless, 'cases interpreting the broad textual
grants of authority to the President and Congress in the areas of
foreign affairs leave only a narrowly circumscribed role for the
Judiciary.'"  Corrie, 503 F.3d at 982 (quoting Alperin, 410 F.3d
at 559).

### a.    The parties' respective positions.

Defendants argue that Plaintiffs' claims are nonjusticiable
because Plaintiffs seek resolution of "sensitive questions of
foreign and military policy constitutionally reserved to the
political branches."  United States' Motion, 3:13-15.  According
to Defendants, Plaintiffs' claims thus conflict with all six
factors articulated above in Baker, 369 U.S. at 217.
///
///
///
///

First, according to Defendants, the issues raised in this case, which Defendants broadly characterize as "the State Department's handling of a kidnapping by insurgents in a war zone and decisions about the use of contractors in Iraq," are textually committed by the Constitution to the political branches. Id., 4:9-17 (citing Corrie, 503 F.3d at 982 (quoting Alperin, 410 F.3d at 559; Oetjen v. Cent. Leather Co., 246 U.S. 297, 302 (1919); Schneider v. Kissinger, 412 F.3d 190, 194-95 (D.C. Cir. 2005)). Defendants acknowledge, as they must, that "not every case touching on foreign relations is nonjusticiable," but they nonetheless contend that nonjusticiability is clear here because "Plaintiffs challenge such delicate matters of foreign and military policy as diplomats' approach to a particular kidnapping in a foreign war zone, policies about how and whether to use private contractors in Iraq, and even the scope of the conflict in Iraq." Id., 5:2-8 (internal citations omitted). Defendants further argue that the second and third Baker tests are satisfied because Plaintiffs' claims are not capable of resolution through judicially discovery and manageable standards, but instead require nonjudicial policy decisions. Id., 5:9-11. According to Defendants, the courts lack competence to address strategic military decisions or to make political judgments, as opposed to legal determinations. Finally, Defendants argue the last three Baker factors are satisfied because there is a real risk in this case of sending a conflicting message regarding decisions already made by a coordinating branch of government. Id., 6:1-12.

///

14

Plaintiffs, though admitting that "[b]ecause the text of the U.S. Constitution commits controversies revolving around foreign affairs and the armed forces to the President, the political question doctrine may preclude from judicial review cases involving military strategy, tactical decision-making, or calculated operations," nevertheless argue that "Article II does not grant the Executive Branch the authority to step outside the United States Constitution." Plaintiffs' Opposition to United States' Motion to Dismiss ("Opp. to United States' Motion"), 8:18-23. Plaintiffs generally contend that their claims either present justiciable questions or that justiciability cannot be determined based solely on the Complaint and absent at least some discovery. According to Plaintiffs, the following issues are particularly justiciable: "(1) ...the issuance of Order No. 17, which is facially Unconstitutional and exempts certain individuals from all operation of all laws, including the United States Constitution; (2) the interference by the Plaintiffs' First Amendment Rights (particularly Defendant Jennifer Foo), such as the instructions that they not be allowed to disseminate printed leaflets, and that the Plaintiffs not communicate with certain individuals, including the criminals who were holding their children; and (3) refusal to follow acts of Congress designed to protect and to compensate the Plaintiffs." Id., 8:24-9:7. Plaintiffs thus argue there is no need for this Court to make sensitive determinations regarding the handling of a kidnapping in a war zone, because Plaintiffs simply ask the Court to evaluate "Defendants' performance of their duties in an unauthorized and unconstitutional manner." Id., 9:15-18.

15

1   More specifically as to the <u>Baker</u> factors, Plaintiffs argue:

2   While the first <u>Baker</u> factor may preclude a plaintiff
3   from suing for injuries in a war zone where the alleged
    wrongs stemmed from the military's strategic and
    tactical decisions, it does not preclude a plaintiff
4   and their family from suing for injuries stemming from
    Defendants' decisions to the extent they conflict with
5   military directives or breach a contract or violate
    basic Constitutional rights.

6

7   <u>Id.</u>, 9:20-26.  As to the second <u>Baker</u> factor, Plaintiffs assert

8   that they only ask "the Court to adjudicate very clear standards

9   of property rights, traditional tort and contract claims, and

10  Constitutional standards that are not novel issues that lack

11  discoverable and manageable standards." <u>Id.</u>, 11:1-4.  According

12  to Plaintiffs, "unlike combat or training operations, the facts

13  of this case are not peculiarly 'military' in nature, and the

14  Court may apply traditional legal principles to resolve their

15  claims." <u>Id.</u>, 11:4-6.  Plaintiffs believe the third, fourth and

16  sixth <u>Baker</u> factors are not implicated here because the Court

17  need not formulate any military policies to resolve this case and

18  because Plaintiffs' claims can be adjudicated without

19  disrespecting or embarrassing the coordinate branches of

20  government.  Finally, Plaintiffs contend the fifth <u>Baker</u> factor,

21  which looks at whether there is an unusual need for unquestioning

22  adherence to a political decision already made, is inapplicable

23  to Plaintiffs' claims for violations of the Constitution or

24  withholding of private benefits.

25  ///

26  ///

27  ///

28  ///

16

1    In Reply, Defendants rebut Plaintiffs' arguments by:

2    1) pointing out that Plaintiffs rely solely on cases in which

3    individuals filed suit against government contractors, not

4    against the United States itself; 2) arguing that to the extent

5    Plaintiffs claim no "military" decisions are implicated in this

6    case, they miss the broader point that "political" questions, not

7    just "military" questions, are precluded from review;

8    3) challenging Plaintiffs' inference that the type of claim

9    (i.e., tort, contract, constitutional, etc.) is dispositive of

10   whether the political question doctrine acts as a bar; and

11   4) claiming no discovery is necessary to justify Defendants'

12   facial attack on subject matter jurisdiction in this case.

13

14                    **b.    Application of the doctrine.**

15

16   Contrary to the case law, which requires a discriminating

17   (and even "surgical") inquiry into each of Plaintiffs' claims,

18   neither Defendants nor Plaintiffs actually engage in such an

19   undertaking.  See Alperin, 410 F.3d at 547 (taking a "surgical"

20   approach to the Baker factors).  Instead, both sides argue

21   generally why the Complaint in its entirety is or is not barred.

22   For purposes of the current analysis, however, this Court is

23   required to examine each of Plaintiffs' causes of action

24   separately.  As will become increasing clear, application of the

25   political question doctrine is thus almost entirely dependent on

26   the characterization of Plaintiffs' claims.

27   ///

28   ///

                                   17

1    Plaintiffs' causes of action are most appropriately analyzed

2  when broken into two categories.  Generally speaking, Plaintiffs'

3  first set of claims includes their declaratory relief cause of

4  action and their injunctive relief causes of action (Procedural

5  Due Process and First Amendment[5] claims).  Plaintiffs' second set

6  of claims is comprised of the various iterations of their Takings

7  cause of action.[6]

8  ///

9  ///

10  ///

---

11

12    [5] Though Plaintiffs did not expressly identify a cause of
action arising under the First Amendment in their Complaint, the

13  Court finds, and Defendants do not seriously contend otherwise,
that Plaintiffs have alleged sufficient facts to state such a

14  claim.  See, e.g., Smith v. Arkansas State Highway Emp., Local
1315, 441 U.S. 463, 464 (1979) ("The First Amendment protects the

15  right of an individual to speak freely, to advocate ideas, to
associate with others, and to petition his government for redress

16  of grievances...The government is prohibited from infringing upon
these guarantees either by a general prohibition against certain

17  forms of advocacy...or by imposing sanctions for the expression
of particular views it opposes.") (internal citations omitted);

18  see also Alvarez v. Hill, 518 F.3d 1152, 1157 (9th Cir. 2009) ("A
complaint need not identify the statutory or constitutional

19  source of the claim raised in order to survive a motion to
dismiss.").

20    [6] According to Plaintiffs' Complaint, their Takings claim is
premised on either the Government's taking of the Decedent's

21  "work" or of Decedent's "lives," but in their Opposition,
Plaintiffs take the position that this cause of action is instead

22  premised on the Government's failure to provide Decedents'
survivors with federal benefits due.  As will be discussed in

23  Section B(2)(b) below, the taking of Decedents' lives is not the
proper subject of a Takings claim.  If this theory of recovery

24  was viable, the Court notes it likely would be more properly
analyzed in conjunction with Plaintiffs' first set of claims.

25  Because this theory fails as a matter of law, however, it is
grouped here for the Court's convenience.  Plaintiffs' other

26  theories are likewise dismissed on alternative bases below.
However, in the interest of resolving the threshold

27  jurisdictional issue before the Court, it will nonetheless be
presumed for purposes of the instant analysis that those claims

28  are properly stated.

18

1                        **(i)  Plaintiffs' first set of claims.**

2

3        Pursuant to their first set of claims, Plaintiffs seek

4  declarations generally pertaining to: 1) the United States' use

5  of civilian contractors in Iraq, the scope of the policies

6  governing those contractors, and the consequences of those

7  policies; 2) the parameters of the "War on Terror"; 3) the extent

8  of immunities enjoyed by contractors working in Iraq and the

9  scope of constitutional rights lost or forgone by those

10 contractors or their families; 4) the United States' handling of

11 a kidnapping by Iraqi insurgents in an Iraqi war zone, which

12 includes the Government's decisions regarding negotiation

13 protocols and policies regarding information dissemination; and

14 5) the availability and extent of the recovery that may be had by

15 survivors of contractors killed during the War on Terror.  In

16 addition, Plaintiffs seek recovery on Procedural Due Process

17 grounds, alleging that they "have a constitutionally protected

18 interest in the lives of their children" and that Defendants

19 deprived them of that constitutionally protected interest

20 "without due process through the use of 'underground

21 regulations,' 'unwritten policies,' and while illegally retaining

22 vendors who were improperly compensated."  Complaint, p. 19,

23 ¶¶ 30-31.  Plaintiffs thus seek an injunction "against

24 Defendants' violations of rights to Due Process guaranteed by the

25 United States Constitution."  Id., p., 19, ¶ 33.

26 ///

27 ///

28 ///

Finally, Defendants assert First Amendment violations based on their allegations that the Government advised Plaintiffs not to meet with individuals who reportedly had information pertaining to Decedents' whereabouts and that the Government blocked the distribution of flyers prepared by Plaintiffs offering a reward for information pertaining to the missing men. Given the policy-driven nature each of the above claims, the Court now holds, pursuant to the following authorities, that each of Plaintiffs' first set of claims present nonjusticiable political questions.

First, in Gilligan v. Morgan, the United States Supreme Court held nonjusticiable First Amendment speech and assembly claims brought by students of Kent State University. 413 U.S. 1 (1973). In that case, the students sought an injunction limiting the Governor of Ohio's ability to call upon National Guard troops to respond to civil disorder. Id. at 3. The students further sought to restrain the National Guard from violating their rights in the future and sought declaratory relief as to the constitutionality of a portion of the Ohio Revised Code. Id. The majority of the plaintiffs' claims were dismissed by the district court, the opinion of which was affirmed on appeal. The appellate court, however, remanded to the district court for consideration of the following question:

> Was there and is there a pattern of training, weaponry and orders in the Ohio National Guard which singly or together require or make inevitable the use of fatal force in suppressing civilian disorders when the total circumstances at the critical time are such that nonlethal force would suffice to restore order and the use of lethal force is not reasonably necessary?

Id. at 4.

///

20

1    As a threshold matter, the Supreme Court stressed the fact
2    that "this [was] not a case in which damages [were] sought for
3    injuries sustained during the tragic occurrence at Kent State.
4    Nor [was] it an action seeking a restraining order against some
5    specified and imminently threatened unlawful action.  Rather, it
6    [was] a broad call on judicial power to assume continuing
7    regulatory jurisdiction over the activities of the Ohio National
8    guard. [That] far-reaching demand for relief present[ed]
9    important questions of justiciability."  Id. at 5.
10   Turning then to a more specific analysis of the students'
11   claims, the Court observed that Congress is constitutionally
12   vested with the power to organize, arm and discipline a Militia.
13   Id. at 6 (quoting U.S. Const., art. I, § 8, cl. 16).  In turn,
14   Congress had passed legislation delegating to the President, as
15   the Commander in Chief of the Armed Forces, the power to regulate
16   the organization and discipline of the National Guard.  Id. at 6-
17   7.  Accordingly, "[t]he relief sought by [the students],
18   requiring initial judicial review and continuing surveillance by
19   a federal court over the training, weaponry and orders of the
20   Guard, would...embrace critical areas of responsibility vested by
21   the Constitution in the Legislative and Executive Branches of the
22   Government."  Id. at 7.  The students' claims thus conflicted
23   with each of the Baker factors, rendering their Complaint
24   nonjusticiable.  Id. at 8-9.
25   ///
26   ///
27   ///
28   ///

21

1    Indeed, that Court observed:

2         It would be difficult to think of a clearer example of
         the type of governmental action that was intended by
3         the Constitution to be left to the political branches
         directly responsible-as the Judicial Branch is not-to
4         the electoral process.  Moreover, it is difficult to
         conceive of an area of governmental activity in which
5         the courts have less competence.  The complex subtle,
         and professional decisions as to the composition,
6         training, equipping, and control of a military force
         are essentially professional military judgments,
7         subject always to civilian control of the Legislative
         and Executive branches.  The ultimate responsibility
8         for these decisions is appropriately vested in branches
         of the government which are periodically subject to
9         electoral accountability.  It is this power of
         oversight and control of military force by elected
10        representatives and officials which underlies our
         entire constitutional system.

11

12   Id. at 10.[7]

13        Plaintiffs' first set of claims here are similar to those

14   brought in Gilligan because Plaintiffs seek broad-reaching

15   judicial regulation over the Government's handling of kidnappings

16   overseas as well as the Government's decisions pertaining to the

17   use of contractors in Iraq.  Just as in Gilligan, there can be no

18   doubt that the Constitution delegates to the Executive Branch the

19   power to regulate the military and to act in the area of foreign

20   affairs.

21   ///

22   ///

23   ///

24

25        [7] In reaching its holding, the Court nonetheless made clear
    that it "neither [held] nor [implied] that the conduct of the
26   National Guard is always beyond judicial review or that there may
    not be accountability in a judicial forum for violations of law
27   for specific unlawful conduct by military personnel, whether by
    way of damages or injunctive relief."  Id. at 11-12.  This caveat
28   will become important in evaluating Plaintiffs' second set of
    claims.

                                22

1   See Corrie, 503 F.3d at 983 ("It is well established  that the

2   conduct of foreign relations is committed by the Constitution to

3   the political departments of the Federal Government; [and] that

4   the propriety of the exercise of that power is not open to

5   judicial review.") (internal citations and quotations omitted);

6   Alperin, 410 F.3d at 559 ("It is axiomatic that the Constitution

7   vests the power to wage war in the President as Commander in

8   Chief...."); Tiffany v. United States, 931 F.2d 271, 277 ("Of the

9   legion of governmental endeavors, perhaps the most clearly marked

10  for judicial deference are provisions for national security and

11  defense...The strategy and tactics employed on the battlefield

12  are clearly not subject to judicial review."); Aktepe v. United

13  States, 105 F.3d 1400, 1403 (11th Cir. 1997) ("Foreign policy and

14  military affairs figure prominently among the areas in which the

15  political question doctrine has been implicated.").[8]  Like the

16  Gilligan claims, Plaintiffs' requests for declaratory and

17  injunctive relief thus seek to second-guess foreign affairs or

18  military decisions made in a context in which these decisions

19  have been constitutionally delegated to the Executive Branch.

20  ///

21  ///

22

23      [8] At least one court has also observed that "[u]nlike the
    political branches, the Judiciary has no covert agents, no
24  intelligence sources, and no policy advisors.  Courts are thus
    institutionally ill-equipped to assess the nature of battlefield
25  decisions or to define the standard for the government's use of
    covert operations in conjunction with political turmoil in
26  another country.  These types of decisions involve delicate,
    complex policy judgments with large elements of prophecy, and are
27  decisions of a kind for which the Judiciary has neither aptitude,
    facilities, nor responsibility."  Al-Aulaqi v. Obama,
28  727 F. Supp. 2d 1, 45 (D.D.C. 2010) (internal quotations and
    citations omitted).

23

1    Indeed, Plaintiffs seek to dictate the manner in which the

2    Government responds to the kidnapping of American citizens in a

3    foreign war zone, as well as the type and breadth of information

4    disseminated by the Government to both the families of the

5    victims and the kidnappers themselves.  Plaintiffs likewise ask

6    this Court to evaluate the scope of Government policies

7    concerning negotiations with "terrorists," by official

8    nomenclature or by any other name, and concerning the use of

9    contractors overseas and in the War on Terror generally.  These

10   "far-reaching" inquiries would require this Court to insert

11   itself into the conduct of foreign affairs and of the United

12   States military.  Accordingly, under <u>Gilligan</u>, Plaintiffs first

13   set of claims is nonjusticiable.

14       The Ninth Circuit's decision in <u>Corrie</u>, 503 F.3d 974,

15   further supports this Court's conclusion here.  In <u>Corrie,</u> the

16   appellate court affirmed dismissal on political question grounds

17   of a challenge brought by individuals against Caterpillar, Inc.,

18   after bulldozers purchased from Caterpillar by the Israeli

19   Defense Forces ("IDF"), and paid for by the United States, were

20   used to demolish homes in the Palestinian Territories.  <u>Id.</u> at

21   977.  The <u>Corrie</u> plaintiffs claimed Caterpillar had actual and

22   constructive notice that the IDF would use the bulldozers to

23   destroy Palestinian homes and that Caterpillar's sales thus

24   violated international law.  <u>Id.</u>

25   ///

26   ///

27   ///

28   ///

24

As a result, the plaintiffs alleged causes of action for:
"(1) war crimes; (2) extrajudicial killing under the Torture
Victim Protection Act; (3) cruel, inhuman, or degrading treatment
or punishment; (4) violations of the Racketeer Influenced and
Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq.;
(5) wrongful death; (6) public nuisance; and (7) negligent
entrustment." Id. at 979. Those plaintiffs sought, among other
things, compensatory and punitive damages, declaratory relief and
an injunction "directing Caterpillar to cease providing equipment
to the IDF so long as its illegal practices continue." Id.

In holding plaintiffs' claims nonjusticiable, the Corrie
court reasoned:

> The decisive factor here is that Caterpillar's sales to
> Israel were paid for by the United States. Though
> mindful that we must analyze each of the plaintiffs'
> 'individual claims,' each claim unavoidably rests on
> the singular premise that Caterpillar should not have
> sold its bulldozers to the IDF. Yet these sales were
> financed by the executive branch pursuant to a
> congressionally enacted program calling for executive
> discretion as to what lies in the foreign policy and
> national security interests of the United States.

Id. at 982 (internal citations omitted). Accordingly, the Corrie
court determined that several of the Baker factors were
implicated by those plaintiffs' claims. Id. at 982-83. Namely,
as discussed above, the first factor was implicated because the
conduct of foreign relations is constitutionally committed to the
political branches. Id. at 983. Likewise, the fourth, fifth and
sixth Baker factors were implicated because foreign aid was not
only committed to the political branches, but those branches had
already made a decision as to that aid. Id. at 983.
///

25

More to the point, since the Executive Branch had already made the policy determination that the bulldozers should be purchased, a contrary finding by the Corrie court would necessarily have questioned, or even condemned, the Executive's stated foreign policy.  Id. at 983-84.

Similarly in the current case, as already stated, Plaintiffs' first set of claims asks the Court to delve into areas of military and foreign affairs committed to the political branches.  In addition, the Executive Branch has already made its determination as to how it uses contractors in foreign military operations, how it handles kidnappings arising in the Iraqi war zone, and how much information, if any, should be released to families.  Were the Court to issue an opinion deciding Plaintiffs' claims at this point, as in Corrie, the Court would very well be questioning, or even condemning, that Executive action already taken.  Accordingly, under Corrie, as under Gilligan, Plaintiffs' first set of claims is nonjusticiable.

Another Ninth Circuit decision, Alperin, 410 F.3d 532, further supports a nonjusticiability finding here.  The Alperin court was faced "with the question whether claims for losses allegedly suffered at the hands of a Nazi puppet regime during World War II [were] cognizable."  Id. at 537.  The plaintiffs, individuals and organizations referred to collectively as the "Holocaust Survivors," claimed that the Vatican Bank, among others, "profited from the genocidal acts of the Croatian Ustasha political regime (the 'Ustasha'), which was supported throughout World War II by Nazi forces."  Id. at 538.
///

"That profit allegedly passed through the Vatican Bank in the form of proceeds from looted assets and slave labor."  Id.  Plaintiffs thus alleged causes of action for "conversion, unjust enrichment, restitution, the right to an accounting, and human rights violations and violations of international law arising out of the defendants' alleged involvement with the Ustasha during and following World War II."  Id.  The district court dismissed all claims on political question grounds, but the appellate court reversed as to the plaintiffs' property claims, which are discussed in the following section, noting with respect to the Holocaust Survivors' "War Objectives Claims, [that] the district court should refrain from hearing those claims that require passing judgment on foreign policy decisions."  Id. at 538, 558.

The War Objectives Claims were based on numerous allegations that the defendants had violated international law.  Id. at 559.  However, in Alperin, the Executive Branch had already exercised its authority pertinent to the evaluation of such alleged violations in a myriad of ways, including through the Nuremberg trials.  Id.  For its part, the Alperin court thus observed that, as a court of the judicial branch, it was not a war crimes tribunal and that "[t]o act as such would require [it] to intrud[e] unduly on certain policy choices and value judgments that are constitutionally committed to [the political branches,] for [it did] not and [could] not know why the Allies made the policy choice not to prosecute the Ustasha and the Vatican Bank."  Id. at 560 (internal citations and quotations omitted).  Accordingly, to adjudicate the War Objectives Claims would have been to invade the province of the Executive.

1    Here, too, for the reasons already discussed, resolution of
2    Plaintiffs' first set of claims would contravene the <u>Baker</u>
3    factors and would require this Court to render policy
4    proclamations regarding issues committed to and already decided
5    by the political branches.  More to the point, resolution of
6    Plaintiffs' first set of claims would almost inevitably require
7    the Court to evaluate and judge existing conditions in Iraq,
8    which would include evaluating military strategies and policies
9    governing the use of contractors, the parameters of America's
10   "War on Terror" and all other turbulent and changing
11   circumstances relating to the United States' occupation of that
12   nation.  Likewise, any of Plaintiffs' requested declarations
13   issued in the abstract would require the Court to render a
14   decision that could embarrass the coordinate branches and
15   conflict with their existing proclamations regarding the
16   propriety of the United States' decisions not to negotiate with
17   terrorists, and, relatedly, to control the information
18   disseminated to families and third parties regarding a kidnapping
19   occurring overseas during a time of war.  This Court simply
20   cannot conceive of all of the justifications for the Executive
21   Branch's decisions in this case, nor does this Court have access
22   to nearly the same resources employed by that branch in reaching
23   its conclusions regarding how to best proceed in managing an
24   international conflict.
25   ///
26   ///
27   ///
28   ///

1  Defendants' Motion to Dismiss Plaintiffs first set of claims

2  pursuant to the political question doctrine is thus granted with

3  leave to amend.[9]

4

5      [9] This conclusion is supported by a number of additional
cases as well. See Tiffany, 931 F.2d 271 (negligence action

6  brought by wife of pilot killed in a mid-air collision with a
United States fighter jet dispatched to visually identify the

7  pilot's aircraft when he flew into a United States Air Defense
Identification Zone without filing a flight plan presented a

8  nonjusticiable political question because "it [was] difficult to
conceive of an area of governmental activity in which the courts

9  have less competence," and "[t]he complex, subtle, and professional
decisions as to the composition, training, equipping, and control

10  of a military force are essentially professional military
judgments, subject always to civilian control of the Legislative

11  and Executive Branches"); Smith v. Reagan, 844 F.2d 195 (4th Cir.
1988) (suit asking "the courts to determine whether American

12  service personnel remain in captivity in southeast Asia and to
assess the adequacy of the executive's efforts to secure the

13  release of any who do" was "fraught with peril for the judiciary"
because it would require the courts "to intrude in the conduct of

14  sensitive diplomatic negotiations," to "make determinations of
fact in an area where the judiciary lacks power to obtain

15  information, and in which it has neither expertise to evaluate
the information brought before it nor standards to guide its

16  review," and might result in cases in which "the judiciary may
speak with multiple voices in an area where it is imperative that

17  the nation speak as one"); Aktepe, 105 F.3d 1400 (suit filed by
Turkish Navy sailors against the United States for death and

18  personal injuries resulting from the United States' firing of
live missiles at a Turkish ship during NATO training exercises

19  simulating live attacks was nonjusticiable because the issues
raised conflicted with some, if not all, of the Baker factors);

20  El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836 (D.C.
Cir. 2010) (suit brought by owners of Sudanese pharmaceutical

21  plant alleging claims as to "whether the United States' attack on
the plant was 'mistaken and not justified'" and as to the

22  "factual validity of the government's stated reasons for the
strike" were non-justiciable); Harbury, 522 F.3d 413 (claims by

23  widow of rebel fighter killed by members of the Guatemalan army
against United States government officials arguing they were

24  responsible for her husband's physical abuse and eventual death
were nonjusticiable); Schneider, 412 F.3d 190 (suit brought by

25  the children and estate of a Chilean general against the United
States and the former national security advisor to recover for

26  the government's role in the kidnapping, torture and death of the
general was nonjusticiable under the first through fourth Baker

27  factors); Al-Aulaqi, 727 F. Supp. 2d 1 (suit brought by alien
father on behalf of his son, a duel American and Yemeni citizen,

28  against the President, the Secretary of Defense and the Director

1          **(ii) Plaintiffs' second set of claims.**

2

3      Pursuant to their second set of claims, which is comprised

4 of Plaintiffs' various theories underlying their Takings cause of

5 action, Plaintiffs allege that the "Constitution prohibits the

6 State of California from taking private property including the

7 lives of the Plaintiffs' children and the work they performed for

8 public use without just compensation."[10]   Complaint, p. 20, ¶ 35.

9 Based on the allegations in their Complaint, it appears

10 Plaintiffs contend that the property wrongfully taken from them

11 included: 1) the lives of Decedents;[11] and 2) the compensation

12 still owed Decedents for work performed for Crescent.   In

13 Opposition to Defendants' instant Motions, however, Plaintiffs

14 also argue Decedents were entitled to compensation directly from

15 the United States Government (i.e., benefits under The Defense

16 Base Act ("DBA"), 42 U.S.C. § 1651, et seq., the Longshore and

17 Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901, and

18 the War Hazards Compensation Act ("WHCA"), 42 U.S.C. § 1701, et

19 seq.).   Opp. to United States' Motion, 5:15-27.

20 ///

21

22 of the CIA arguing defendants unlawfully authorized the "targeted

23 killing" of plaintiff's son based on his alleged ties to a group
affiliated with al Qaeda was nonjusticiable under the first,

24 fourth, and sixth Baker factors).

25     [10] Though Plaintiffs allege that the "State of California"
is precluded from taking private property without just

26 compensation, for the purposes of this Order it will be presumed
Plaintiffs meant the United States.

27     [11] As stated in Note 6 above, the Court will not address

28 this theory, which fails as a matter of law, in this Section.   It
is included here simply for uniformity.

Assuming the viability of these remaining theories for purposes of this jurisdictional discussion, the Court now finds each of these claims justiciable.

First, as stated above, the Gilligan Court left open the possibility that some claims involving the military may be viable.  413 U.S. at 11-12.  This caveat was later relied upon in Scheurer v. Krause, 416 U.S. 232 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984), a case arising out of the same Kent State incident as did Gilligan.  In Scheurer, without explicitly addressing the political question doctrine, the Supreme Court implicitly determined claims brought by the estates of three students killed during the underlying Kent State tragedy and seeking to recover damages from the Governor of Ohio, the Adjutant General and his assistant, officers and enlisted members of the National Guard and the president of Kent State were justiciable.  Id. at 234.  Accordingly, while Scheurer was not a political question case per se, it does serve to indicate that some damages suits against government actors should be permitted to proceed despite the nonjusticiability of other claims arising out of the same factual predicate.

Plaintiffs' Takings claims are more akin to the damages claims alluded to in Gilligan, and directly at issue in Scheurer, than to the claims actually adjudicated in Gilligan because, by their claims, Plaintiffs do not necessarily challenge the Government's general policies in the realm of foreign affairs or military strategy, but instead simply seek either compensation for work performed or some other manner of monetary benefits.

31

From the face of Plaintiffs' Complaint, resolution of the property claims would not require the Court to trespass into areas constitutionally relegated to the coordinate branches and, instead, would simply require the Court to analyze causes of action historically conducive to judicial review.  See, e.g., Al-Aulaqi, 727 F. Supp. 2d at 50 (discussing cases in which "U.S. citizens have been permitted to sue the United States for alleged unconstitutional takings of their property by the U.S. military abroad").

The Ninth Circuit's decision in Alperin, 410 F.3d 532, which was discussed above in support of the nonjusticiability of Plaintiffs first set of claims, also supports a finding that Plaintiffs' second set of claims is justiciable.  While the district court in Alperin dismissed all claims on political question grounds, the appellate court reversed in part, holding that Plaintiffs' property claims (conversion, unjust enrichment, restitution, and an accounting) were not so barred.  Id. at 538. As to those property claims, that court determined none of the Baker tests were inextricable from the analysis and that "[s]imply because a foreign bank [was] involved and the case [arose] out of a 'politically charged' context [did] not transform [those claims] into political questions."  Id. at 548.

More specifically in that case as to the first Baker factor, "unlike some World War II-era claims, the Holocaust Survivors' claims [were] not expressly barred by treaty," nor were they the subject of executive agreement.  Id. at 549-50.  Accordingly, no formal Executive action would have been contravened by the court's entertaining of the plaintiffs' claims.

Absent some relevant executive proclamation, that court concluded that "[r]eparation for stealing, even during wartime, is not a claim that finds textual commitment in the Constitution." Id. at 551.

Addressing the second Baker factor, the court determined the property claims could be resolved under judicially discoverable and manageable standards. Id. at 556. The relevant inquiry was "whether the courts are capable of granting relief in a reasoned fashion or, on the other hand, whether allowing the Property Claims to go forward would merely provide 'hope' without a substantive legal basis for a ruling." Id. at 553. Since the plaintiffs' claims "involve[d] identifiable personal property for which federal statutes, common law, state law, and well-established case law provide concrete legal bases for courts to reach a reasoned decision," the second Baker test was not implicated. Id. at 553, 555.

The court likewise determined none of the remaining Baker factors were at issue because: 1) adjudicating the property claims would not require the court to make any policy pronouncements; 2) the State Department was aware of the appeal, but had declined to intervene; 3) the Holocaust Survivors had not indicated any disagreement with a particular political decision; and 4) there was an absence of "pronouncements" by the political branches that might have been contravened by a decision of the court. Id. at 555-58.

///

///

///

1    Here, as in Alperin, Plaintiffs' second set of claims
2  present only a straight-forward property or takings analysis that
3  does not require inquiry into the military or other governmental
4  policies underlying Plaintiffs' above policy-based claims.   To
5  the contrary, these claims can likely be resolved without
6  reference to foreign policy or military strategy and instead
7  require only inquiry into well-established standards governing
8  all claims for compensation due.   Stated another way, in
9  resolving Plaintiffs' Takings cause of action, which requires the
10 Court only to determine whether certain prerequisites to
11 compensation exist, there will be no reason for the Court to
12 second-guess executive strategy decisions such as why the
13 Government is in Iraq, whether its contractor policies are proper
14 or whether the deaths of Decedents could have been avoided.
15 Accordingly, under Alperin, Plaintiffs' second set of claims is
16 justiciable.

17    Support for the justiciability of Plaintiffs' claims can
18 also be found in Koohi v. United States, 976 F.2d 1328 (9th Cir.
19 1992).   In Koohi, the Ninth Circuit rejected a political question
20 challenge to claims brought by the families of civilian
21 passengers of an Airbus shot down by the United States during an
22 undeclared tanker war in the Persian Gulf.   Id. at 1329, 1332.
23 In that case, Iran and Iraq were engaged in hostilities and Iran
24 began concentrating attacks on ships carrying Iraqi-oil and
25 flying under the Kuwaiti flag.   Id. at 1330.   The United States
26 agreed to assist Kuwait to protect its ships, the effect of which
27 was to assist Iraq as well.   Id.
28 ///

34

The United States then began to engage in combat with Iranian naval vessels, which eventually led to the incident underlying those plaintiffs' complaints.  Id.

On the date of the challenged incident, the USS Vincennes, a naval cruiser, dispatched a helicopter to investigate Iranian gunboat activity.  Id.  The helicopter was allegedly fired upon, and the Vincennes crossed into Iranian waters and fired at the gunboats.  Id.  Just a few minutes later, a civilian Iranian Airbus took off and followed its flight path directly into the midst of the conflict.  Id.  The Vincennes crew mistook the Airbus for an Iranian fighter and shot it down, killing all 290 passengers aboard.  Id.

The Koohi plaintiffs asserted two types of claims premised on the construction of the air defense system deployed on the Vincennes: "claims against the United States for the negligent operation of the Vincennes and claims against the weapons manufactures for design defects in the Aegis system."  Id.  The Ninth Circuit held Plaintiffs' claims justiciable because: 1) "governmental operations are a traditional subject of damage actions in federal courts"; and 2) "federal courts are capable of reviewing military decisions, particularly when those decisions cause injury to civilians."  Id. at 1331.  "A key element in [the court's] conclusion that the plaintiffs' action [was] justiciable [was] the fact that the plaintiffs [sought] only damages for their injuries.  Damage actions are particularly judicially manageable.

///

///

35

By contrast, because the framing of injunctive relief may require the courts to engage in the type of operational decision-making beyond their competence and constitutionally committed to other branches, such suits are far more likely to implicate political questions." Id. at 1332.

Under Koohi, Plaintiffs' second set of claims is justiciable for the reasons stated above and because Plaintiffs' damages action is not likely to implicate the same policy and strategy decisions as would Plaintiffs' requests for declaratory or injunctive relief. Namely, if successful, Plaintiffs will recover for past injuries sustained in the taking of labor or the failure to provide benefits, but that recovery would not necessarily require this Court to issue broad and far-reaching relief undermining any Executive decision made as to policies underlying the use of contractors, managing a war-time kidnapping or the proper dissemination of information during a time of war.

Finally, Ramirez de Arellano v. Weinberger, 745 F.2d 1500 (D.C. Cir. 1984), vacated and remanded for reconsideration on other grounds by Weinberger v. Ramirez de Arellano, 471 U.S. 1113 (1985), provides further support for a justiciability finding here. In that case, the owner of a private cattle ranch in Honduras, who is referred to individually here though he filed suit on behalf of himself and a number of wholly-owned entities, sued the Secretaries of State and Defense for taking his property, namely his ranch, without his permission by operating a large military training facility for Salvadoran soldiers on part of his land. Id. at 1505-06.

///

1   The plaintiff specifically requested declaratory and injunctive

2   relief for the occupation and destruction of his property without

3   authority and for the deprivation of property without due

4   process.  Id. at 1505.

5        The district court held plaintiff's claims nonjusticiable

6   because they challenged "the propriety of the United States

7   military presence in Central America."  Id. at 1511.  The

8   appellate court disagreed, however, finding that plaintiff "[did]

9   not seek to adjudicate the lawfulness of the United States

10  military presence abroad.  Instead, [he sought] adjudication of

11  the narrow issue whether the United States defendants may run

12  military exercises throughout the plaintiff's private pastures

13  when their land has not been lawfully expropriated."  Id. at

14  1512.  Plaintiff did not "challenge the United States military

15  presence in Honduras or in Central America, nor did [he] object

16  to United States sponsorship of a Regional Military Training

17  Center in Honduras."  Id.  According to the appellate court,

18  "[t]his is a paradigmatic issue for resolution by the Judiciary.

19  The federal courts historically have resolved disputes over land,

20  even when the United States military is occupying the property at

21  issue."  Id.  Finally, the plaintiff "[did] not seek judicial

22  monitoring of foreign policy in Central America nor [did he]

23  challenge United States relations with any foreign country.  The

24  case [did not] raise the specter of judicial control and

25  management of United States foreign policy."  Id. at 1513.

26  ///

27  ///

28  ///

1   The instant case is on par with <u>Ramirez de Arellano</u> because,
2   as already stated, the Court need not adjudicate the propriety of
3   any United States policy decisions regarding the use of
4   contractors or the handling of a kidnapping during a time of war
5   to determine whether Plaintiffs are owed compensation for
6   services performed under the employ of a civilian contractor.
7   The issue here is simply whether civilians working in conjunction
8   with the military are entitled to compensation or benefits from
9   the United States and, if so, what the compensation or benefits
10  might be.  Because Plaintiffs' claims do not necessarily
11  challenge the Government's policies underlying the United States'
12  presence in Iraq, and instead simply challenge the Government's
13  alleged retention of funds due Decedents, Plaintiffs' second set
14  of claims is thus justiciable.  Accordingly, under the above
15  authorities, Plaintiffs' Takings cause of action, except to the
16  extent premised on the taking of Decedents' lives, is
17  justiciable, and Defendants' Motion to Dismiss that claim
18  pursuant to the political question doctrine is denied.
19
20          **(iii)  Plaintiffs' additional case law.**
21
22  In Opposition to Defendants' Motions, Plaintiffs rely
23  primarily on three cases, <u>McMahon v. Presidential Airways, Inc.</u>,
24  502 F.3d 1331 (11th Cir. 2007), <u>Lane v. Halliburton</u>, 529 F.3d 548
25  (5th Cir. 2008), and <u>Carmichael v. Kellogg, Brown & Root Serv.,</u>
26  <u>Inc.</u>, 572 F.3d 1271 (11th Cir. 2009).  Because these cases are
27  distinguishable on their facts and unremarkable in their
28  holdings, they provide no support for the Plaintiffs' position.

Due to the gravity of the harms inflicted and the issues at stake in this case, however, the Court nonetheless takes this opportunity to engage in a brief discussion of those authorities, which are inapplicable here for two reasons. First, each of the above cases involved claims against contractors; the United States was not a Defendant, or even a party, to those disputes. Rather, individuals injured in some manner sued contractors working for the United States military, and those contractors in turn invoked the political question doctrine as a defense. In addition, though Plaintiffs believe those cases stand for the proposition that discovery is necessary to properly evaluate justiciability, discovery was only permitted in those instances because it was not clear from the face of those plaintiffs' complaints that each of plaintiffs' claims was nonjusticiable.

In McMahon, the court was faced with claims brought by the survivors of United States soldiers against civilian contractors providing air transportation and operational services overseas after the soldiers were killed when an airplane transporting them crashed into a mountain in Afghanistan. 502 F.3d at 1336. Though it relied on Aktepe and Tiffany for the proposition that the political branches are constitutionally vested with power over the military, the court observed that the case before it was:

///

///

///

///

///

1    at least one step removed from both [of those cases]
2    because it [was] against a private contractor....[The
     private contractor was] not, itself, a coordinate
     branch of the United States government.  Nor [was] it,
3    like the military, part of a coordinate branch of the
     United States government.  To invoke the first <u>Baker</u>
4    factor, [the contractor] must therefore carry a double
     burden.  First, it must demonstrate that the claims
5    against it will require reexamination of a decision by
     the military.  Then, it must demonstrate that the
6    military decision at issue is...insulated from judicial
     review.

7

8   <u>Id.</u> at 1359-60 (internal citations omitted) (emphasis omitted).

9        The <u>McMahon</u> plaintiffs' claims arose out of the contractor's

10  staffing, equipping and operation of a flight transporting

11  American soldiers, all of which were contractor responsibilities,

12  and it was not evident from the complaint that any action of the

13  military was implicated.  <u>Id.</u> at 1360-61.  Accordingly, on that

14  facts of that case, and at that early stage in litigation, the

15  court could not say that "resolution of [the] case [would]

16  require the court to decide a political question."  <u>Id.</u> at 1365.

17       The court in <u>Lane</u> was similarly faced with a claim brought

18  by civilian truck drivers, or their spouses or dependents,

19  against logistical support services contractors for injuries the

20  drivers sustained in Iraq.  529 F.3d at 554.  The truck drivers,

21  who had been promised by the contractors that they would be

22  ensured a safe work environment, were injured or killed by Iraqi

23  insurgents while transporting fuel.  <u>Id.</u> at 554-55.

24  ///

25  ///

26  ///

27  ///

28  ///

The plaintiffs alleged: 1) "fraud based claims including fraud
and deceit, fraud in the inducement, intentional concealment of
material facts, intentional misrepresentation, and civil
conspiracy to commit fraud"; and 2) non-fraud based claims,
consisting of intentional infliction of emotional distress,
negligence and gross negligence, wrongful death and survivorship
causes of action.  Id. at 555.  Some plaintiffs also asserted
"federal civil rights violations under 42 U.S.C. § 1983 and
violations, along with conspiracy to commit violations, of the
Racketeer Influenced and Corrupt Organizations Act."  Id.  While
the Lane court acknowledged that some of Plaintiffs' claims
"move[d] precariously close to implicating the political question
doctrine, and further factual development very well may
demonstrate that the claims are barred," it would have been
premature for that court to determine that any political
questions would actually be implicated in the resolution of the
plaintiffs' suit.  Id. at 567.

Plaintiffs rely on both of the above cases for the
proposition that, either no political question is present here or
it is premature to make such a determination.  However, as
stated, the question of whether decisions of the coordinate
branches were implicated by the above plaintiffs' claims was not
necessarily apparent from the face of their complaints because
the United States was not a party to those actions and because
decisions of the military were not necessarily challenged.  To
the contrary in this case, Plaintiffs have chosen to sue the
Government directly and have directly challenged Executive Branch
actions, policies and procedures.

1    In addition, neither of the above cases stand for the
2  proposition that justiciability questions are always premature
3  when addressed on a less than fully-developed factual record. To
4  the contrary, at this stage in the proceedings, Plaintiffs
5  benefit from the Court's assumption that all facts alleged in the
6  Complaint are true.  Mortensen, 549 F.2d at 891.  It is only if
7  the allegations supporting each of Plaintiffs' claims cannot be
8  construed to state a justiciable claim that dismissal is
9  warranted.  At a later stage, however, the facts on which
10  Plaintiffs rely may be more limited, which would likewise also
11  limit Plaintiffs' potential claims.  See McMahon, 502 F.3d at
12  1365 ("We expressly do not (and could not) hold that this
13  litigation will not at some point present a political
14  question."); Lane, 529 F.3d at 568 ("Permitting this matter to
15  proceed now does not preclude the possibility that the district
16  court will again need to decide whether a political question
17  inextricably arises...").  Indeed, that is precisely what
18  happened in Carmichael, 572 F.3d 1271.

19    In Carmichael, the wife of a soldier severely injured while
20  escorting a military convoy through Iraq, sued the civilian
21  contractor she claimed was responsible for negligently causing
22  her husband's injuries.  Id. at 1275-76.  Unlike the above cases,
23  in Carmichael the military maintained "plenary control" over the
24  relevant convoys.  Id. at 1276.  Accordingly, early in
25  litigation, the Carmichael defendants brought an initial motion
26  to dismiss on justiciability grounds, which motion was denied.
27  Id. at 1279.  After the close of discovery, however, the
28  defendants renewed their motion, which was then granted.  Id.

42

The appellate court affirmed because "adjudicating the plaintiff's claims would require extensive reexamination and second-guessing of many sensitive judgments surrounding the conduct of a military convoy in war time-including its timing, size, configurations, speed, and force protection." Id. at 1275. In addition, the court could "discern no judicially manageable standards for resolving plaintiff's claims." Id.

Plaintiffs thus rely on Carmichael for the proposition that they should be permitted additional time to conduct discovery to show that their claims are justiciable. Plaintiffs' argument is flawed to the extent this Court has already determined that, on the face of Plaintiffs' Complaint, at least as to their first set of claims, Plaintiffs failed to state a justiciable claim. Stated another way, additional discovery is only warranted if Plaintiffs' claims as alleged may, at this point in the proceedings, be justiciable. Based on the above analysis regarding Plaintiffs' first set of claims, they cannot be saved by additional discovery and Plaintiffs' argument is necessarily rejected. To the contrary, Plaintiffs' second set of claims appear justiciable at this point, and thus survive Defendants' initial attack. Plaintiffs' case law serves then only to support the proposition that the Government could later renew its Motions if facts uncovered through discovery indicate that the Takings cause of action too is barred. Accordingly, Plaintiffs' authority is not helpful to their cause and does little to add to the above analysis.

///

///

1          **3.    Conclusion.**

2

3     Plaintiffs' first set of claims, comprised of their

4   declaratory relief, Procedural Due Process and First Amendment

5   causes of action, are hereby dismissed with leave to amend as

6   nonjusticiable, while their second set of claims, which is

7   comprised of their Takings cause of action, is not.  While this

8   result may seem somewhat unsettling in light of the magnitude of

9   the harms suffered by both Decedents and Plaintiffs, resolution

10  of the political question issue does not turn on the tragic

11  nature of their injuries.  To be sure, this Court has the utmost

12  respect for Decedents and their service to this country, and the

13  Court's decision that some of Plaintiffs' claims are barred as

14  nonjusticiable must not in any way be construed to minimize

15  Plaintiffs' loss or to diminish the extent of the grief and

16  anguish Plaintiffs have suffered.[12]

17

18      [12] Other courts have likewise acknowledged how disconcerting
    it may be to determine such grievous injuries are not capable of
19  redress before the judiciary.  See Alerpin, 410 F.3d at 562 ("Our
    decision to affirm the district court's dismissal of the War
20  Objectives Claims is not a result we reach lightly.  We do not
    wish to imply in the slightest that these claims do not represent
21  gravely serious harms for which the Holocaust Survivors deserve
    relief.  The difficulty is that relief lies elsewhere...In this
22  case, the Holocaust Survivors must look to the political branches
    for resolution of the War Objectives Claims which, at base, are
23  political questions."); id. at 568 (Trott, J., dissenting) ("No
    one could possibly be comfortable identifying a barrier to the
24  relief sought by these plaintiffs, persons who suffered some of
    the most unspeakably grievous injuries to their lives and
25  families...Nevertheless our courts are not the appropriate for
    redress."); see also Smith, 844 F.2d at 202 ("The desire to
26  account for American service personnel still missing after the
    Vietnam War runs deep.  Such an accounting would go far in
27  healing the wounds which remain from that difficult chapter in
    our nation's history.
28

**B.  Defendants' Motion to Dismiss Plaintiffs' Official Capacity Causes of Action**

**1.  Plaintiffs' requests for injunctive and declaratory relief.**

**a.  Standing.**

Defendants argue Plaintiffs lack standing to pursue their claims for declaratory and injunctive relief because they have failed to allege they are likely to suffer any imminent future injury.  A plaintiff bears the burden of establishing "that he has standing for each type of relief sought."  <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 129 S. Ct. 1142, 1149 (2009).

To show Article III standing for injunctive relief, a plaintiff must demonstrate the existence of an "imminent and actual" threat of injury that is "not conjectural and hypothetical."  <u>Id.</u>  "Past exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects."  <u>Mayfield v. U.S.</u>, 599 F.3d 964, 970 (9th Cir. 2010) (<u>citing</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560, 112 S. Ct. 2130 (1992)).

///

///

Perhaps more importantly, it would end the anxiety and frustration, if not all of the pain, borne by the families of these servicemen. We must, however be mindful of the constraints our Constitution places on the judiciary.  Our system of government confines each branch to a limited sphere.  No one branch of our government can cure all ills, and institutional hubris is more likely than not to result in new and greater ills. In this suit, plaintiffs ask the courts to intrude in an area in which they have no rightful power and no compass.").

"Once a plaintiff has been wronged, he is entitled to injunctive relief only if he can show that he faces a 'real or immediate threat... that he will again be wronged in a similar way.'" <u>Id.</u> at 970 (<u>quoting</u> <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 111, 103 S. Ct. 1660 (1983)).

In this case, Plaintiffs allege only past injuries as a result of Defendants' conduct.  Plaintiffs do not allege that they or any friends or family members are currently serving as civilian contractors or that any of the past harms alleged in the Complaint may for any reason occur again in the future, let alone in the imminent future.  Accordingly, Plaintiffs lack standing to pursue their claims for injunctive relief.

Under the same logic, Plaintiffs' declaratory relief claims fail as well.  The lack of a controversy of any sufficient immediacy essentially renders Plaintiffs' claims impermissible requests for advisory opinions:

> The federal courts established pursuant to Article III of the Constitution do not render advisory opinions. For adjudication of constitutional issues, concrete legal issues, presented in actual cases, not abstractions are requisite.  This is as true of declaratory judgments as any other field.  The difference between an abstract question and a controversy contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy.  Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy any reality to warrant the issuance of a declaratory judgment.

///

///

///

46

Golden v. Zwickler, 394 U.S. 103, 108 (1969) (internal citations
and quotations omitted).  As with Plaintiffs' claims for
injunctive relief, their declaratory relief claims are entirely
premised on past harms and there are no allegations within the
Complaint that Plaintiffs might at some point be subject to
Defendants' same policies and actions such that any live
controversy warranting future declaratory relief exists.

     In Opposition to Defendants' Motion, Plaintiffs nonetheless
claim they have suffered "injury in fact" and that Defendants
continue to deny them benefits pursuant to an official policy to
"withhold insurance benefits, back pay, and to avoid federal
statutes that allow additional benefits for all similarly
situated persons."  Opp. to United States' Motion, 14:16-20.
Plaintiffs' argument is flawed in at least two ways.  First,
Plaintiffs allege no facts indicating that the United States, as
opposed to Crescent, withheld any insurance benefits or back pay
from Decedents or Plaintiffs, nor do Plaintiffs allege anywhere
in their Complaint that they are owed any sort of federal
benefits.  In addition, Plaintiffs' allegations regarding
withheld compensation and benefits are all pled with regards to
their Takings claim, under which they seek monetary compensation
or damages, not an injunction.  Accordingly, by way of their
Opposition, Plaintiffs conflate their requests for damages and
injunctive relief by essentially arguing that Defendants should
be forced, via an injunction, to pay Plaintiffs monies owed.
///
///
///

47

1  Such relief under the facts alleged in this case would not be

2  injunctive; it would be legal.[13]   Plaintiffs' attempts to save

3  their equitable claims thus fail.

4      Finally, Plaintiffs make at least one reference in the

5  Complaint to their status as taxpayers.  To the extent Plaintiffs

6  attempt to allege taxpayer standing, their argument is rejected.

7  See Valley Forge Christian College v. Americans United for

8  Separation of Church and State, Inc., 454 U.S. 464, 477 (1982)

9  ("[T]he expenditure of public funds in an allegedly

10 unconstitutional manner is not an injury sufficient to confer

11 standing, even though the plaintiff contributes to the public

12 coffers as a taxpayer."); DaimlerChrysler Corp. v. Cuno, 547 U.S.

13 332, 347 (2006) (taxpayer suits have only been permitted under

14 the Establishment Clause of the Constitution).

15     Accordingly, in light of these above authorities, Plaintiffs

16 lack standing to pursue their declaratory and injunctive relief

17 claims, and Defendants' Motions to Dismiss those claims is thus

18 granted with leave to amend on this alternative basis as well.

19 ///

20 ///

21 ///

22 ///

23 ///

24

25     [13] Even if Plaintiffs' characterization of their Takings
   cause of action as a request for injunctive relief was proper,
26 that characterization would fail for the related reason that
   monetary damages do not generally constitute irreparable harm.
27 Goldie's Bookstore, Inc. v. Superior Court of State of Cal.,
   739 F.2d 466, 471 (9th Cir. 1984) ("Mere financial injury...will
28 not constitute irreparable harm if adequate compensatory relief
   will be available in the course of litigation.").

1          **b.   Likelihood of imminent future harm.**

2

3          The same logic employed in the preceding section is equally

4   applicable to support the conclusion that Plaintiffs' equitable

5   claims must fail on the merits because Plaintiffs have not

6   sufficiently alleged they are likely to suffer imminent future

7   injury.  Plaintiffs' equitable remedies can proceed only if there

8   is a "showing of irreparable injury, a requirement that cannot be

9   met where there is no showing of any real or immediate threat

10  that the plaintiff[s] will be wronged again-a likelihood of

11  substantial and immediate irreparable injury."  Hodgers-Durgin v.

12  De La Vina, 199 F.3d 1037, 1042 (9th Cir. 1999) (quoting Lyons,

13  461 U.S. at 111) (internal quotations omitted); id. at 1044

14  ("[F]ailure to establish a likelihood of future injury similarly

15  renders...[claims] for declaratory relief unripe.").  Since

16  Plaintiffs have alleged only past harms, Defendants' Motion to

17  Dismiss for Plaintiffs' failure to allege the requisite imminent

18  future harm is granted with leave to amend as to Plaintiffs'

19  declaratory relief, Procedural Due Process and First Amendment

20  claims.

21

22          **2.   Plaintiffs' requests for monetary relief.**

23          **a.   Sovereign immunity.**

24

25          Defendants move to dismiss Plaintiffs' requests for monetary

26  relief as barred by the Government's sovereign immunity because

27  Plaintiffs, citing to both 42 U.S.C. § 1983 and the Fifth

28  Amendment, seek to recover "compensation" or "damages."

49

First, Section 1983 does not contain a statutory waiver of the federal government's immunity and thus does not provide an avenue through which Plaintiffs can pursue their monetary claims.   <u>Morse v. N. Coast Opportunities, Inc.</u>, 118 F.3d 1338, 1343 (9th Cir. 1997); <u>Taylor v. Donley</u>, 2010 WL 958067, *4 (E.D.Cal.).   In addition, as to Fifth Amendment Takings cause of action, any waiver of immunity is contained in either the Tucker Act, 28 U.S.C. § 1491(a)(2), or the little Tucker Act, 28 U.S.C. § 1346(a)(2), both of which preclude the majority of Plaintiffs' claims in this Court.

The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

The Little Tucker Act, in turn, provides for concurrent district court jurisdiction over:

> [a]ny...civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1346(a)(2).   "Read together, these statutes provide for jurisdiction solely in the Court of Federal Claims for Tucker Act claims seeking more than $10,000 in damages, and concurrent district court jurisdiction over claims seeking $10,000 or less." <u>McGuire v. United States</u>, 550 F.3d 903, 910-11 (9th Cir. 2008).

///

1    Plaintiffs do not specify in this case the amount of

2    compensation they seek by way of their monetary claims.  If

3    Plaintiffs seek to recover less than $10,000, sovereign immunity

4    has been waived and jurisdiction is proper in this Court.  If

5    Plaintiffs seek in excess of $10,000, however, their claims must

6    be brought in the Court of Federal Claims.  Plaintiffs' failure

7    to allege any jurisdictional amount is thus itself fatal to their

8    instant cause of action.  Karahalios v. Defense Language Inst.

9    Foreign Language Ctr. Presidio of Monterey, 534 F. Supp. 1202,

10   1209 n.6 (N.D. Cal. 1982) ("If plaintiff chooses to amend his

11   complaint, he should indicate the amount of the damages he is

12   requesting, so that we can determine whether this case falls

13   within the jurisdictional amount requirement imposed upon us by

14   28 U.S.C. 1346."); Hafen v. Pendry, 646 F. Supp. 2d 159, 160

15   (D.D.C. 2009) ("The plaintiff in this case has not satisfied his

16   burden of establishing subject matter jurisdiction by pleading a

17   dollar amount.").

18   Finally, in Opposition to Defendants' sovereign immunity

19   defense, Plaintiffs attempt to invoke the waiver provisions of

20   the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671, et

21   seq.  Defendants reply that, even assuming Plaintiffs' claims

22   were properly pled, Plaintiffs have still failed to exhaust

23   administrative remedies, therefore depriving this Court of

24   jurisdiction over any FTCA claims.  28 U.S.C. § 2675; Brady v.

25   United States, 211 F.3d 499, 502 (9th Cir. 2000).  Moreover, an

26   FTCA waiver of sovereign immunity is subject to a number of

27   exceptions applicable here.

28   ///

1   See 28 U.S.C. § 2680 (e.g., excepting from waiver of sovereign

2   immunity liability arising from discretionary functions, from

3   claims arising out of combatant activities, and from claims

4   arising in foreign countries).  Accordingly, Plaintiffs cannot

5   avoid the sovereign immunity bar by resort to the FTCA, and

6   Defendants' Motion to Dismiss Plaintiffs' monetary claims is thus

7   granted with leave to amend.[14]

8

9              **b.    Failure to state a claim.**

10

11      Finally as to their substantive arguments, Defendants

12   contend Plaintiffs' claims should be dismissed pursuant to

13   Rule 12(b)(6) for failure to state a claim.  On a motion to

14   dismiss for failure to state a claim under Rule 12(b)(6), all

15   allegations of material fact must be accepted as true and

16   construed in the light most favorable to the nonmoving party.

17   Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336,337-38 (9th Cir.

18   1996).  Rule 8(a)(2) "requires only 'a short and plain statement

19   of the claim showing that the pleader is entitled to relief,' in

20   order to 'give the defendant fair notice of what the [...] claim

21   is and the grounds upon which it rests.'"  Bell Atl. Corp. v.

22   Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson,

23   355 U.S. 41, 47 (1957)).

24   _____

25      [14] Plaintiffs mention in passing that they "seek the return
     of specific property and federal benefits, which are not subject
26   to sovereign immunity." Opp. to United States' Motion, 18:19-21.
     Plaintiffs, however, failed to allege any facts supporting this
27   theory in their Complaint, and they admit as much in their
     Opposition. Id., 18:24-25.  Accordingly, Plaintiffs newly raised
28   theories do not prevent dismissal here.

1  A complaint attacked by a Rule 12(b)(6) motion to dismiss does
2  not require detailed factual allegations.  However, "a
3  plaintiff's obligation to provide the grounds of his entitlement
4  to relief requires more than labels and conclusions, and a
5  formulaic recitation of the elements of a cause of action will
6  not do."  Id. (internal citations and quotations omitted).  A
7  court is not required to accept as true a "legal conclusion
8  couched as a factual allegation."  Ashcroft v. Iqbal, ___ U.S.
9  ____, 129 S. Ct. 1937, 1950 (2009) (quoting Twombly, 550 U.S. at
10 555).  "Factual allegations must be enough to raise a right to
11 relief above the speculative level."  Twombly, 550 U.S. at
12 555 (citing 5 Charles Alan Wright & Arthur R. Miller, Federal
13 Practice and Procedure § 1216 (3d ed. 2004) (stating that the
14 pleading must contain something more than "a statement of facts
15 that merely creates a suspicion [of] a legally cognizable right
16 of action.")).

17      Furthermore, "Rule 8(a)(2)...requires a 'showing,' rather
18 than a blanket assertion, of entitlement to relief."  Twombly,
19 550 U.S. at 556 n.3 (internal citations and quotations omitted).
20 Thus, "[w]ithout some factual allegation in the complaint, it is
21 hard to see how a claimant could satisfy the requirements of
22 providing not only 'fair notice' of the nature of the claim, but
23 also 'grounds' on which the claim rests."  Id. (citing 5 Charles
24 Alan Wright & Arthur R. Miller, supra, at § 1202).  A pleading
25 must contain "only enough facts to state a claim to relief that
26 is plausible on its face."  Id. at 570.  If the "plaintiffs...
27 have not nudged their claims across the line from conceivable to
28 plausible, their complaint must be dismissed."  Id.

However, "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" Id. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

As mentioned briefly above, Plaintiffs' Takings claim is premised on the theory that the Government took the "lives of the Plaintiffs' children and the work they performed for public use without just compensation." Complaint, p. 20, ¶ 35. Plaintiffs' first theory fails because the "taking" of a life is not the proper subject of a Fifth Amendment claim. See Jones v. Philadelphia Police Dept., 2003 WL 193695 *2 (3d Cir.) (rejecting argument that "one's body is private property that may be taken by the United States for any governmental purpose of any kind upon the payment of just compensation"). Plaintiffs' latter theory likewise fails because the Complaint contains no allegations that the Government, as opposed to Crescent, took anything from Decedents.

In their Opposition to Defendants' Motions, Plaintiffs thus retreat from the above theories and appear to argue instead that they seek federal benefits directly from the United States. Indeed, Plaintiffs allege they are entitled to compensation under the LHWCA, the DBA and the WHCA. Plaintiffs' Complaint is nonetheless devoid of any allegations supporting these claims. Accordingly, Defendants' Motion to Dismiss Plaintiffs' Takings cause of action is granted with leave to amend for failure to state a claim.

///

///

### 3.   Service of process.

Defendants' final argument for dismissal of the claims brought against them in their official capacities is premised on Plaintiffs' alleged technical failures in effecting service. Pursuant to Federal Rule of Civil Procedure 4(m), service of the summons and complaint must be made upon a defendant within 120 days after the filing of the complaint.  In the event Plaintiff fails to timely serve process, the court shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time.  Fed. R. Civ. P. 4(m).  If the plaintiff, however, shows good cause for the failure, the court shall extend the time for an appropriate period.  Id.

Rule 4(m) contains both a mandatory and a discretionary component.  If a plaintiff shows good cause for the defective service, the district court must extend the time period for service.  In re Sheehan, 253 F.3d 507, 512 (9th Cir. 2001).  "At a minimum, 'good cause' means excusable neglect."  Boudette v. Barnette, 923 F.2d 754, 756 (9th Cir. 1991).  With respect to the discretionary component of the rule, the district court has discretion to grant an extension even absent good cause.  Mann v. Am. Airlines, 324 F.3d 1088, 1090 (9th Cir. 2003).

To properly serve Defendants, officers of the United States sued in their official capacity, Plaintiffs must "serve the United States and also send a copy of the summons and of the complaint by registered or certified mail to the...officer." Fed. R. Civ. Pro. 4(i)(2).

///

1   To serve the United States, Plaintiff must: A) "deliver a copy of
2   the summons and of the complaint to the United States attorney
3   for the district where the action is brought–or to an assistant
4   United States attorney or clerical employee whom the United
5   States attorney designates in a writing filed with the court
6   clerk"; or B) "send a copy of each by registered or certified
7   mail to the civil-process clerk at the United States attorney's
8   office."  Fed. R. Civ. P. 4(i)(1)(A). In addition, Plaintiff must
9   "send a copy of each by registered or certified mail to the
10  Attorney General of the United States at Washington, D.C."
11  Fed. R. Civ. P. 4(i)(1)(B).

12        In this case, Defendants argue that, despite having filed
13  their Complaint on March 22, 2010, Plaintiffs did not attempt to
14  serve the United States Attorney for the Eastern District of
15  California[15] or the United States Attorney General until the
16  beginning of January 2011, well outside the 120-day period
17  prescribed by Rule 4(m).  In addition, Plaintiffs allegedly
18  failed to include a copy of the Summons among the documents
19  actually served on the United States Attorney or the Attorney
20  General and purportedly failed to serve the Attorney General by
21  registered or certified mail.

22  ///

23  ///

24  ///

25  ///

26

27        [15] Though Defendants concede Plaintiffs at least attempted
    to serve the United States Attorney, the Court is unable to
28  locate a record of that service on its docket.

In Opposition, Plaintiffs make only the conclusory assertions that service was proper and that any arguments going to the propriety of service have been waived by Defendants' subsequent appearances before this Court.  Defendants' arguments, especially lacking any meaningful opposition by Plaintiffs, are well-taken.  However, this Court nonetheless declines to dismiss this case on the basis of improper service.  Rather the Court will permit Plaintiffs to serve any amended complaint Plaintiffs elect to file upon Defendants in conformity with Rule 4 not later than ten (10) days after the date Plaintiffs' amended complaint is electronically filed.

### C.   Defendants' Motion to Dismiss Plaintiffs' Individual Capacity Causes of Action

#### 1.   Personal jurisdiction.

According to Defendants, this Court lacks personal jurisdiction over them in their individual capacities.  A party may seek dismissal of a claim for lack of personal jurisdiction under Rule 12(b)(2).  The burden of establishing personal jurisdiction rests with the plaintiff.  Boschetto v. Hansing, 539 F.3d 1011, 1015 (9th Cir. 2008).  If the court decides a Rule 12(b)(2) motion without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of the facts in support of personal jurisdiction.  Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d 1163, 1168 (9th Cir. 2006).  In deciding whether a prima facie showing has been made, a court need only consider the pleadings and any submitted affidavits.  Boschetto, 539 F.3d at 1015.

1  All uncontroverted allegations are taken as true, and

2  "[c]onflicts between parties over statements contained in

3  affidavits must be resolved in the plaintiff's favor."

4  Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th

5  Cir. 2004).

6       Where there is no federal statute governing personal

7  jurisdiction, courts apply the long arm statute of the state in

8  which the court sits.  Boschetto, 539 F.3d at 1015.  The

9  applicable California statute allows the exercise of jurisdiction

10 to the full extent permitted by federal constitutional due

11 process.  Id.  As a result, "the jurisdictional analyses under

12 state law and federal due process are the same."  Schwarzenegger,

13 374 F.3d at 801.  Due process requires that the nonresident

14 defendant have certain "minimum contacts" with the forum, such

15 that the exercise of jurisdiction does not offend "traditional

16 notions of fair play and substantial justice."  Int'l Shoe Co. v.

17 Washington, 326 U.S. 310, 316 (1945).

18      There are two different forms of personal jurisdiction from

19 a due process perspective, general and specific.  Boschetto,

20 539 F.3d at 1016.  A court has general jurisdiction over a non-

21 resident defendant when the defendant's contacts with the forum

22 are "substantial" or "continuous and systematic."  Bancroft &

23 Masters, Inc. v. August Nat. Inc., 223 F.3d 1082, 1086 (9th Cir.

24 2000).  The standard for establishing general jurisdiction is an

25 exacting standard that requires the defendant's contacts to

26 approximate physical presence in the forum state.

27 Schwarzenegger, 375 F.3d at 801.

28 ///

Plaintiffs do not allege sufficient facts to warrant, nor do they

attempt to justify in their Opposition, a finding of general

jurisdiction here.

The Court's exercise of specific jurisdiction is proper only

upon satisfaction of a three-prong test:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its law;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice.

Brayton Purcell LLP v. Recordon & Recordon, 606 F.3d 1124, 1128

(9th Cir. 2010) (quoting Schwarzenegger, 374 F.3d at 802).  The

plaintiff has the burden of establishing the first two prongs.

Boschetto, 593 F.3d at 1016.  If the first two prongs are

satisfied, the burden shifts to the defendant, who is required to

put on a "compelling case" demonstrating that the exercise of

jurisdiction would be unreasonable.   Id.

Defendants argue Plaintiffs have failed to adequately allege

personal jurisdiction is proper in this Court because Plaintiffs

have alleged almost no facts pertaining to either named Defendant

individually and because the facts alleged are insufficient to

show either Defendant purposefully availed herself of

jurisdiction here.

///

///

///

Plaintiffs allege only that: 1) two of the family members filing the instant action reside in Redding, California; 2) one of the Decedents negotiated his contract with "defendants" while he was in California; 3) Defendant Clinton, and to some extent Defendant Foo, oversee State Department policies; and 4) Defendant Foo worked to impede the families' efforts to find their sons, failed or refused to relay information to Plaintiffs and conducted conference calls in which Plaintiffs were told that the Government had information, but that it could not be released.

First, the instant Plaintiffs' residence is irrelevant to the personal jurisdiction inquiry.  In addition, no allegations in the Complaint indicate that the Decedent who allegedly negotiated his Crescent contract in California engaged in those negotiations with either Defendant.  Accordingly, these allegations are insufficient to support a personal jurisdiction finding.

Defendants thus primarily argue that "[a]n official's oversight of national or international policies does not give rise to personal jurisdiction in any forum where the effects of those policies are allegedly felt."  Motion, 6:11-16 (citing Hill v. Pugh, 75 Fed. Appx. 715, 719 (10th Cir. 2003); McCabe v. Basham, 450 F. Supp. 2d 916, 926-27 (N.D. Iowa 2006); Wag-aero, Inc. v. United States, 837 F. Supp. 1479, 1485 (E.D. Wis. 1993); Vu v. Meese, 755 F. Supp. 1375, 1378 (E.D. La. 1991)).  Plaintiffs largely ignore this argument in Opposition and simply reiterate that Defendant Clinton "is violating the constitution through her continuation of the ultra vires and Unconstitutional policies of her predecessor."  Opp. to Individual Defendants' Motion, 8:17-18.

1  Defendants here have the better argument, and this Court holds

2  that allegations limited to national policy implementation and

3  oversight are insufficient to support a finding of personal

4  jurisdiction because a contrary finding would essentially subject

5  the individual Defendants to personal liability in every state in

6  the Union regardless of how tenuous their actual contacts with a

7  particular forum might be.

8      The only contacts attributable to either Defendant that can

9  thus be derived from the Complaint are based on Plaintiffs'

10 allegations that Defendant Foo conducted conference calls with

11 the families of Decedents.  Plaintiffs fail, however, to

12 specifically allege that any of these calls were directed to

13 parties in California.  Indeed, while Plaintiffs in their

14 Opposition posit several tenuous theories that may connect

15 Defendant Foo to this forum, those theories are not actually pled

16 in the Complaint.  Regardless, even if Plaintiffs had alleged

17 that some of the conference call participants were located in

18 California, jurisdiction in this case would still be improper.

19 See Applied Underwriters Inc. v. Combined Mgmt., Inc., 371 Fed.

20 Appx. 834, 835 (9th Cir. 2010); Roth v. Garcia Marquez, 942 F.2d

21 617, 622 (9th Cir. 1991) ("[O]rdinarily 'use of the mails,

22 telephone, or other international communications simply do not

23 qualify as purposeful activity invoking the benefits and

24 protection of the [forum] state."). Plaintiffs' minimal allegations

25 connecting Defendants to this forum are thus insufficient to

26 establish personal jurisdiction over either individual, and

27 Defendants' Motion to Dismiss Plaintiffs' Complaint for lack of

28 personal jurisdiction is granted with leave to amend.

1          **2.    Venue.**

2

3          Defendants next argue venue is improper in this district.

4    Both Rule 12(b)(3) and 28 U.S.C. § 1406(a) authorize the Court to

5    dismiss an action on grounds that venue is improper.  Plaintiffs

6    have the burden of proof to show that venue is proper here.

7    Piedmont Label Co. v. Sun Garden Packing Co., 598 F.2d 491, 496

8    (9th Cir. 1979); Hope v. Otis Elevator Co., 389 F. Supp. 2d 1235,

9    1243 (E.D. Cal. 2005).  Unlike a motion to dismiss for failure to

10   state a viable claim under Rule 12(b)(6), on a motion for

11   improper venue under Rule 12(b)(3), "the pleadings need not be

12   accepted as true and the court may consider supplemental written

13   materials and consider facts outside the pleadings" in its

14   adjudication.  Kelly v. Qualitest Pharm, Inc., 2006 WL 2536627 at

15   *7 (E.D. Cal. 2006) (citing Murphy v. Scheider Nat'l, Inc.,

16   362 F.3d 1133, 1137 (9th Cir. 2004).  The decision to dismiss for

17   improper venue, or alternatively to transfer venue to a proper

18   court, is a matter within the sound discretion of the district

19   court.  Cook v. Fox, 537 F.2d 370, 371 (9th Cir. 1976).

20         Plaintiffs allege venue lies in this Court under 28 U.S.C.

21   § 1391(b)(1) and (2).  Section 1391(b) provides, in pertinent

22   part:

23              A civil action wherein jurisdiction is not founded
                solely on diversity of citizenship may, except as
24              otherwise provided by law, be brought only in (1) a
                judicial district where any defendant resides, if all
25              defendants reside in the same State, [or] (2) a
                judicial district in which a substantial part of the
26              events or omissions giving rise to the claim occurred,
                or a substantial part of property that is the subject
27              of the action is situated.

28   ///

1    Plaintiffs do not and cannot allege that both Defendants

2  reside in the Eastern District of California.  Venue under

3  Section (b)(1) is therefore improper.  In addition, the only

4  allegations Plaintiffs make relevant to this District in support

5  of a Section (b)(2) finding that a "substantial part of the

6  events or omissions" occurred here is that two of the Plaintiffs

7  reside here and that one of the Decedent's contracts with the

8  Crescent "was negotiated and executed in the State of

9  California."  Complaint, p. 2, ¶ 1; id., p. 3, ¶ 2.  In

10  Opposition, Plaintiffs make little effort to support their choice

11  of venue and state only that "venue is proper because many of the

12  events took place in this judicial district."  Opp. to Individual

13  Defendants' Motion, 11:1-2.  For the same reasons Plaintiffs'

14  allegations are insufficient to support personal jurisdiction

15  over the individual Defendants, those allegations are

16  insufficient to support venue in this Court as well.

17  Accordingly, Defendants' Motion to Dismiss for improper venue is

18  granted with leave to amend.

19

20         **3.   Service of process.**

21

22    As they did in their Motion to Dismiss Plaintiffs' official-

23  capacity claims, Defendants also argue service was improper as to

24  the individual-capacity Defendants.  In this instance, Defendants

25  reiterate their same above arguments, but further emphasize that

26  Plaintiffs have not even attempted to serve Defendants

27  individually.

28  ///

Defendants' arguments are again well-taken, but the Court again declines to dismiss this action on this ground.  As already stated, since Plaintiffs' claims are dismissed for alternative reasons, should Plaintiffs elect to file an amended complaint, service on the individual Defendants must be effected in conformity with Rule 4 within ten (10) days of the date their amended complaint is electronically filed.

### 4.    Failure to state a claim.

According to Defendants, Plaintiffs' Takings cause of action fails against the individual-capacity Defendants for the same reasons it fails against Defendants in their official capacities. Namely, Plaintiffs have only alleged facts indicating that Crescent, not the Government, wrongfully withheld funds. Accordingly, Plaintiffs' factual allegations as to the individual Defendants are insufficient on their face.

Even if Plaintiffs had stated a Takings claim generally, however, Defendants argue that Plaintiffs failed to properly plead their claims against the individual Plaintiffs as a Bivens action.  See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).  According to Defendants, no Bivens action can lie for a Takings claim because an alternative, existing process, namely a Tucker Act claim, exists to protect Plaintiffs' interests.  See, e.g., Reunion, Inc. v. FAA, 719 F. Supp. 2d 700, 710 (S.D. Miss. 2010); Anoushiravani v. Fishel, 2004 WL 1630240 at *8-9 (D. Or.).

///

1  Plaintiffs cite no authority to the contrary nor has this Court

2  found any Ninth Circuit authority resolving this issue.

3  Accordingly, in light of the availability of alternative remedies

4  to protect Plaintiffs' interests, their Takings claim against the

5  individual Defendants must fail.

6      Though Plaintiffs do not address the merits of Defendants'

7  argument in their Opposition, they contend that "[t]he Complaint

8  may be recast to properly allege claims based on state law tort

9  theories, breach of contract, and Constitutional violations."

10 Opp. to Individual Defendants' Motion, 12:2-4.  Plaintiffs'

11 argument ignores the fact that Defendants' 12(b)(6) Motion is

12 directed at the allegations in Plaintiffs' Complaint as currently

13 pled, not as they might be pled on amendment.  Given the lack of

14 any substantive allegations going to the individual Defendants'

15 withholding of compensation or benefits from the decedents, and

16 in light of Plaintiffs' lack of meaningful opposition to

17 Defendants' arguments, Defendants' Motion to Dismiss Plaintiffs'

18 claims against them in their individual capacities for failure to

19 state a claim is granted with leave to amend.[16]

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26

27      [16] Given the Court's holding that Plaintiffs failed to state

28 a claim against the individual Defendants, this Court need not
   address the merits of Defendants' qualified immunity defense.

5.    **Declaratory and injunctive relief**.


Defendants contend that Plaintiffs cannot seek injunctive and declaratory relief from the individual capacity Defendants. Plaintiffs concede this point and, if necessary, will amend their Complaint to clarify that they do not seek such relief from either Defendant individually.  Accordingly, Defendants' Motion is granted with leave to amend as to Plaintiffs' requests for declaratory and injunctive relief.


D.    **Plaintiffs' Objections and Request for Judicial Notice**


On the date this matter came on for hearing, Plaintiffs filed an Objection and Motion to Strike Defendants' Motions to Dismiss and a Request for Judicial Notice.  Neither request adds anything relevant to the parties' papers or the above analysis and thus both requests are denied without prejudice to renewal at some later date.


**CONCLUSION**


For the reasons just stated, Plaintiffs' Objection and Motion to Strike (ECF No. 37) and Request for Judicial Notice (ECF No. 38) are DENIED.  Defendants' Motions to Dismiss (ECF Nos. 19 and 21) are GRANTED with leave to amend.  Not later than forty-five (45) days following the date this Memorandum and Order is electronically filed, Plaintiff may (but is not required to) file an amended complaint.

1   If no amended complaint is filed within said forty-five (45) day

2   period, without further notice to the parties, this action will

3   be dismissed with prejudice.

4          IT IS SO ORDERED.

5   Dated: September 29, 2011

6

7   _____

8   MORRISON C. ENGLAND, JR.
    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28