UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MARK MUNNS, et al.,                    No. 2:10-cv-00681-MCE-EFB

         Plaintiffs,

    v.                                 MEMORANDUM AND ORDER

HILLARY DIANE RODHAM CLINTON,
et al.,

         Defendants.

                        ----oo0oo----

     Presently before the Court is a Motion to Dismiss ("Motion")
Plaintiffs' First Amended Complaint ("FAC") filed by Defendants
Hillary Diane Rodham Clinton and Jennifer Foo (collectively
"Defendants") in their official capacities as Secretary of State
of the United States and as an employee of the Office of the
Secretary of State, respectively.  Defendants already
successfully moved to dismiss (hereafter "First Motions")
Plaintiffs' original Complaint ("Original Complaint"), see
Munns v. Clinton, ___ F. Supp. 2d ____, 2011 WL 4566004 (E.D.
Cal.) ("Original Order"), and now, Plaintiffs' FAC is DISMISSED
without leave to amend for essentially the same reasons.

                              1

**BACKGROUND**

**A.   Factual Background**

Given the substantial similarity between the Original Complaint and the FAC, the Court's iteration of the facts here is taken primarily from its Original Order granting Defendants' First Motions, motions they filed in both their individual and official capacities.  Original Order, 2011 WL 4566004, *1-4.  Unless material differences between the pleadings are specifically identified, all of the below facts were alleged in both the Original Complaint and the FAC.  The Court has chosen to detail the facts in this manner because, as will become clear below, Plaintiffs have not materially amended their Complaint and the Court's resolution of Defendants' First Motions in its Original Order is thus still directly on point here.

The original Plaintiffs were the families ("Family Plaintiffs") of three men, Joshua Munns, John Young and John Cote, who were killed in Iraq in 2008 ("Decedents").  Decedents were employed by a private contractor, Crescent Security ("Crescent"), that performed security functions under contract with the United States Government.[1]

---

[1] According to the FAC, at some point prior to the events giving rise to Plaintiffs' claims, the Government "created an 'authorized' list of private contractors."  See, e.g., FAC, ¶ 3. The Government purportedly "oversee[s]" those private contractors, including Crescent, and the agreements entered into by the contractors and their employees.  Id.  Though Plaintiffs' attempt to implicate the Government in the FAC is more explicit than their attempt in their Original Complaint, Plaintiffs nonetheless made similar allegations that the employment contracts were "authorized" by the Secretary of State even in their initial pleading.  Original Complaint, p. 12, ¶ 19.

2

1    In addition, Gary D. Bjorlin, a former Marine who is
2    presently classified as a contractor, has now also been joined as
3    a Plaintiff.  FAC, ¶ 9.  According to the FAC, Mr. Bjorlin
4    previously served in Iraq.  <u>Id.</u>

5    The events underlying the Complaint were triggered in 2006
6    when Crescent assigned Decedents and four other men to guard a
7    one and one-half mile long military convoy traveling from Kuwait
8    to Southern Iraq.[2]  According to Plaintiffs, Crescent issued the
9    men substandard equipment, ordered another security team that was
10   supposed to assist in the duty to stand down, and failed to
11   provide the men proper instructions or job guidelines.  In
12   addition, Iraqi security team members, who were also Crescent
13   employees, failed to appear for the assignment, leaving only the
14   seven men to guard the convoy.

15   While under Decedents' guard, the convoy stopped at an Iraqi
16   checkpoint.  After three to five minutes of waiting, a white
17   pickup truck approached and shot at the rear vehicle, which was
18   not occupied by any of the Decedents.  Decedents themselves,
19   however, were also stopped by Iraqi men in police uniforms.  They
20   were stripped of their communications gear and weapons, bound and
21   forced into the backs of different vehicles.  Plaintiffs allege
22   one of the Iraqi officers was a former Crescent employee and that
23   Crescent's Iraqi interpreter was also working with the group
24   orchestrating the hijacking.

25   ///

26

27      [2] Plaintiffs note in the FAC that "[t]he war in Iraq was
     declared officially ended" several years earlier, in May of 2003.
28   <u>Id.</u>, ¶ 16.

3

1   When the Iraqi men eventually received a phone call
2   notifying them that the United States military was en route, the
3   men packed up and left with Decedents as captives.  Other
4   individuals were left behind and were able to relay the
5   aforementioned facts.  Plaintiffs have since been told, among
6   other things, that the kidnapping took place in full view of the
7   United States military, but that the Government did nothing to
8   intercede.

9   According to Plaintiffs, from this point forward, "federal
10  officials who were assigned to assist the families while they
11  sought the return of their adult children, such as Defendant
12  Jennifer Foo, actually worked to impede the families' work and
13  created 'government policies' to block their efforts to save
14  their sons."  Original Complaint, p. 7, ¶ 7; <u>see also</u> FAC, ¶ 24.
15  Members of the State Department, including Defendant Foo, also
16  allegedly: 1) failed or refused to relay information to
17  Plaintiffs; 2) advised members of the families they should not
18  meet with an individual[3] who had reportedly obtained information
19  on the location and condition of the missing men; 3) refused to
20  distribute or blocked the distribution of leaflets asking for
21  information about the hostages; 4) told families the FBI was
22  pursuing leads that would not be described; and 5) claimed to
23  have relevant information that could not be relayed to Plaintiffs
24  because it was "classified."
25  ///
26  ///
27

28      [3] In the FAC, Plaintiffs clarify that this individual was a
    fellow United States citizen.  FAC, ¶ 25.

4

1    More specifically, Plaintiffs allege, among other things,
2  that they had collected funds and prepared 90,000 flyers (printed
3  in English and Iraqi) for distribution in the Middle East.  These
4  flyers offered a reward for information pertaining to the missing
5  men, but the State Department blocked their distribution.
6  Plaintiffs contend in their FAC that "[o]ther families, whose
7  children were not under contract with the State Department or the
8  DOD, were allowed to freely negotiate for the return of their
9  children" and that "there is no provision in the contracts signed
10  by the decedents that provided a waiver of any of the private
11  citizen's rights."  Id., ¶ 27.

12    In addition, though Plaintiffs were provided with audio and
13  video "proofs of life," the United States refused to make contact
14  with the kidnappers under the policy that "America does not
15  negotiate with terrorists."  Original Complaint, p. 9, ¶ 12; FAC,
16  ¶ 29.  In the FAC, Plaintiffs contend "no similar policy was
17  applied to other citizens during the same period of time."  FAC,
18  ¶ 29.  In any event, Plaintiffs dispute whether the United States
19  actually considers the kidnappers in this case to be "terrorists"
20  or simply considers them "common criminals."

21    After the families saw little progress in either the
22  location or rescue efforts, the United States Drug Enforcement
23  Administration ("DEA") interceded in the matter on behalf of a
24  DEA employee who was a family member of one of the missing men.
25  The DEA determined that the kidnappers had given up trying to
26  negotiate with the United States because the kidnappers believed
27  they had no "negotiating partner."
28  ///

As an apparent last resort, the kidnappers eventually cut off one of each Decedents' fingers, later obtained by the DEA, and still the United States would not negotiate.  Decedents were thereafter brutally beaten, tortured and beheaded.  Only then, after their deaths, did the United States finally negotiate for the return of Decedents' bodies.

Plaintiffs contend that, throughout this ordeal, they were provided very little information by either the United States Government or Crescent.  Plaintiffs still have not been given employment contracts, life insurance information or other related employment documents.

In addition, Plaintiffs allege Crescent has improperly withheld life insurance benefits that are due the families and has required the families to sign releases of liability in order to receive those funds.  Plaintiffs believe they are entitled to these life insurance proceeds and potentially to back pay due the kidnapped men, and it is their position that "Defendant Secretary of State is ultimately responsible for its contractor's nonpayment and retention of private benefits."  FAC, ¶ 43.  In the FAC, Plaintiffs clarify that they value these benefits and back pay at over $100,000 per Decedent.  Id., ¶¶ 24, 36-37.

Also new to their FAC, though discussed by the parties in the context of Defendants' First Motions, are Plaintiffs' allegations that "it is Defendants' policy not to provide benefits for contracts such as those detailed in the U.S. Army Material Command..., Army Pamphlet 715-18."  Id., ¶ 46.

///

///

1  More specifically, Plaintiffs contend Defendants "provide no
2  payment under the Defense Base Act ("DBA"), [42 U.S.C. § 1651, <u>et</u>
3  <u>seq.</u>]," which incorporates the Longshore and Harbor Workers'
4  Compensation Act ("LHWCA") and which "affords compensation
5  benefits for the injury or death of any employee engaged in any
6  DBA-covered employment under certain contracts." <u>Id.</u>, ¶ 47.
7  Plaintiffs likewise aver that Defendants "provide no payment
8  under the War Hazards Compensation Act ("WHCA")[, 42 U.S.C.
9  § 1701, <u>et</u> <u>seq.</u>,]..., which provides compensation for employees
10 in the event of war hazards." <u>Id.</u>, ¶ 48.

11      Aside from benefits or payments to which Plaintiffs claim
12 they are entitled, they also again allege that the Secretary of
13 State has "refused to provide, or was incapable of providing,
14 even the most basic information, such as copies of Crescent
15 Security contracts, Lloyd's of London life insurance information"
16 or other documents.  Original Complaint, p. 11, ¶ 17; FAC, ¶ 35.[4]
17 In light of the lack of information received from the Government,
18 Plaintiffs have purportedly had to rely on third parties for
19 information.
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 _____

27 [4] In the FAC, Plaintiffs contend these documents are private
   property under Defendants' control.  FAC, ¶ 37.  According to
   Plaintiffs, the "value or costs of reproducing these
28 documents...[is] less than $20.00." <u>Id.</u>

7

For example, Plaintiffs allege they heard rumors that the kidnapping may have been motivated by revenge for incidents that occurred as a result of the passage of the Coalition Provisional Authority ("CPA") Order 17, which is allegedly a State Department regulation creating absolute immunity for private contractors killing anyone in Iraq.[5]   Plaintiffs also garnered information from the book "Big Boy Rules, America's Mercenaries Fighting in Iraq," by Steve Fainaru.

Ultimately, as a result of the above events, Plaintiffs initiated this suit alleging causes of action for: 1) declaratory relief; 2) Procedural Due Process Clause violations; and 3) violations of the Takings Clause of the United States Constitution.   The Court also interpreted Plaintiffs' Original Complaint to allege a claim for injunctive relief under the First Amendment.   <u>See</u> Original Order, 2011 WL 4566004, *9 n.5.

More specifically, in their Original Complaint, Plaintiffs asked the Court to make the following declarations:

> Whether CPA (Coalition Provision Authority) Order 17, was and is a proper application of government authority under the United States Constitution when it provided for a complete waiver of all laws, including those of Iraq and those enacted by the United States Congress. Complaint, p. 15, ¶ 26(a).

---

[5] For purposes of this instant Motion, and because it will not change the Court's analysis, the Court will accept Plaintiffs' interpretation of Order 17 as true.   The Court notes however, that a plain reading of the Order undermines Plaintiffs' interpretation.   According to the Government, and consistent with this Court's own reading of the directive, Order 17 appears to exempt contractors only from Iraqi legal process not from all laws of this country as well.   <u>See</u> Motion, Attachment 2, CPA Order Number 17, § 4.

Whether as a consequence of CPA Order 17, Iraq became a "free fire zone" where contractors were allowed to shot [sic] at anything with complete impunity t [sic] whenever they felt, in their sole discretion, physically threatened.  Id., p. 16, ¶ 26(b).

Whether CPA Order 17 gave rise to and helped foster the contractor and subcontractor culture in Iraq, where companies like Crescent literally sprang up overnight and were nothing more than a folding table, some stationary, and a couple beat-up trucks with AK-47 machine guns, but sanctioned to do business on behalf of the United States and listed by the Secretary of State and Department of Defense as legitimate business entities.  Id., p. 16, ¶ 26(c).

Whether the numbers and statistics have been so skewed throughout the Iraq conflict that no one in the Office of the Secretary State can really tell Plaintiffs how much money we spent and how many contractors employed by the United States have been lost; in essence, who is doing the fighting for the United States.  Id., p. 16, ¶ 26(d).

[W]hat the parameters are of the "War on Terror" and who exactly the United Stats [sic] is fighting.  Id., p. 17, ¶ 26(e).

[H]ow far federal immunity extends to a private contractor like Crescent or an American Citizen who is recruited and serves in this war under a private contract that is let through the Secretary of State. Further, what inalienable Constitutional rights are lost or given up by a private citizen, such as the Plaintiffs' sons, when he or she executes such a contract and whether it is a public document that should be made available to the families of those citizens and the public?  Id., p. 17, ¶ 26(f).

Within the "War on Terror" how far does a family's Constitutional and Due Process Rights extend?  Id., p. 17, ¶ 26(g).

Whether the families of contractors were legally prohibited from negotiating with the kidnappers, who were referred to by President as "common criminals" – in other words, not "terrorists," and what are the origins of this "official policy," and why did it not apply to similarly situated Iraqis.  Whether there is an official policy in the United States government that "we do not negotiate with terrorists."  Id., p. 17, ¶ 26(h).

9

1   |   What recovery may be made by a family or surviving
2   |   spouse of a private contractor employed in the 'War on
    |   Terror?' And how does one recover under the employment
3   |   contracts that no one has ever seen, or receive life
    |   insurance benefits taken out by the companies in the
    |   names of the contractors without anyone's knowledge?"
4   |   Id., p. 18, ¶ 26(I).

5       In their FAC, Plaintiffs have somewhat tempered their above

6   requests, and now Plaintiff Bjorlin only seeks declarations

7   regarding:

8       |   Whether CPA...Order 17, was and is a proper application
        |   of government authority under the United States
9       |   Constitution when it provided for a complete waiver of
        |   all laws, including those of Iraq and those enacted by
10      |   the United States Congress and the rights found in the
        |   United States Constitution.
11
        |   Whether the families of private contractors should be
12      |   prohibited from negotiating with the kidnappers who are
        |   deemed "common criminals" – in other words, kidnappers
13      |   who are not defined as "terrorists" by the Defendants.

14  FAC, ¶ 50.

15      In asking the Court to consider the above issues, Plaintiff

16  Bjorlin clarifies that he "does not challenge the conduct of the

17  war in Iraq, or the various policies that apply to contractors

18  generally." Id. To the contrary, Mr. Bjorlin avers he "is a

19  citizen who supports the United States foreign policy decisions

20  in the region." Id., ¶ 51. Mr. Bjorlin therefore "does not

21  challenge the Executive branch and the Congressional right to

22  handle foreign policy as it relates to the 'war on terror.'"

23  Id., ¶ 52. Instead, Plaintiff Bjorlin believes only "that CPA

24  Order 17 is an Unconstitutional exercise of Executive Branch

25  authority because it authorizes a narrowly defined group of

26  individuals, namely security contractors, to circumvent the

27  authority of Congress, the Courts, and the Constitution." Id.

28  ///

10

While he "does not challenge the political decisions of the Executive Branch or Congress," Mr. Bjorlin nonetheless believes he "has a right to know his future duties and responsibilities under CPA Order 17, or any related order with similar language in which he could be ordered to kill or injure another human being in the course of carrying out his contract." Id., ¶ 51.

Plaintiffs have made additional modifications to their other causes of action as well. For example, in their FAC, as opposed to their Original Complaint, Plaintiffs make clear that they are indeed pursuing First Amendment claims arising out of the State Department's refusal to permit family members to meet with a fellow American citizen who reportedly had information regarding the missing men and out of the Government's decision to block the distribution of Plaintiffs' flyers. See id., ¶¶ 1, 54-59. In addition, while in the Original Complaint Plaintiffs sought relief under the Procedural Due Process Clause on the basis that "Defendants deprived Plaintiffs of their constitutionally protected interest in the lives of their children," Original Complaint, p. 19, ¶ 31, Plaintiffs now also argue that Defendants are withholding Decedents' private property (i.e., insurance benefits, back pay, and benefits owed under the DBA, LHWCA and WHCA), FAC, ¶ 61.

Similarly, in their Original Complaint, Plaintiffs based their Takings cause of action on the theory that the Government is prohibited from taking "the lives of the Plaintiffs' children and the work they performed for public use without just compensation." Original Complaint, p. 20, ¶ 35.

///

11

Plaintiffs also alleged there, "[t]o the extent that said Plaintiffs' sons' labor was converted to public use, Plaintiffs [were] entitled to just compensation for their property." Id. In their FAC, however, Plaintiffs have limited their Takings claim to the latter theory and now argue solely that Decedents' labor and private benefits (including insurance proceeds) were taken in violation of the Constitution. FAC, ¶ 66. Plaintiffs thus seek "just compensation for the value of the private property seized for public use" or, alternatively, damages. Id., ¶ 67.

Finally, Plaintiffs have added two defendants, Lloyds of London ("Lloyds") and CNA Financial Corporation ("CNA") (collectively "Insurance Defendants"), as well. Lloyds purportedly issued life insurance policies to Crescent insuring the lives of Decedents and listing Family Plaintiffs as beneficiaries. Id., ¶ 12. CNA similarly issued life insurance policies, which, contrary to the Lloyds policies, were issued directly to Decedents, but were also payable to the Family Plaintiffs. Id., ¶ 13. Plaintiffs allege contract-related causes of action against these new defendants, who have not yet appeared in this Court.

## B.   Procedural Background

Plaintiffs initiated this action on March 22, 2010. Defendants subsequently moved to dismiss Plaintiffs' Original Complaint on March 7, 2011, arguing as to Plaintiffs' claims against Defendants in their official capacities that:

12

1 │ 1) Plaintiffs' claims raised nonjusticiable political questions;
2 │ 2) Plaintiffs lacked standing to seek a declaration or an
3 │ injunction because they failed to allege an imminent future
4 │ injury; 3) Plaintiffs likewise failed to satisfy the
5 │ preconditions for injunctive and declaratory relief because they
6 │ did not allege a likelihood of future injury; 4) the Court should
7 │ have declined to exercise its discretion to issue injunctive or
8 │ declaratory relief; 5) sovereign immunity barred Plaintiffs'
9 │ claims for compensation; 6) Plaintiffs failed to state a claim
10 │ under the Takings Clause; and 7) Plaintiffs failed to properly
11 │ serve Defendants.  Defendants also challenged Plaintiffs' claims
12 │ against them in their individual capacities on a variety of
13 │ related and unrelated grounds.

14 │     The Court granted Defendants' First Motions with leave to
15 │ amend holding, among other things, that: 1) Plaintiffs' claims
16 │ for injunctive and declaratory relief (essentially their
17 │ declaratory relief, Procedural Due Process and First Amendment
18 │ causes of action) were nonjusticiable; 2) Plaintiffs lacked
19 │ standing to pursue those same claims; 3) Plaintiffs failed to
20 │ plead the necessary imminent harm to properly state their
21 │ injunctive and declaratory relief causes of action;
22 │ 4) Plaintiffs' monetary claims (essentially their Takings cause
23 │ of action) were barred by the Government's sovereign immunity;
24 │ and 5) Plaintiffs failed to state a claim under the Takings
25 │ Clause as a matter of law.  The Court also ordered Plaintiffs to
26 │ properly serve all Defendants within ten (10) days of filing the
27 │ FAC.
28 │ ///

13

1    Plaintiffs thereafter amended their Complaint as just

2  discussed and filed the FAC with the Court.[6]  Now before the

3  Court is Defendants' Motion seeking dismissal of Plaintiffs'

4  claims alleged against them in their official capacities on

5  essentially the same grounds as they raised in their First

6  Motions.  All parties appeared before this Court through their

7  respective counsel on Friday, February 24, 2012.  For the

8  following reasons, Defendants' Motion is GRANTED without leave to

9  amend.

10

11                          **STANDARD**

12      **A.   Motion to Dismiss for Lack of Subject Matter
                Jurisdiction Under Federal Rule of Civil Procedure**
13              **12(b)(1).[7]**

14

15    Federal Courts are presumptively without jurisdiction over

16  civil actions, and the burden of establishing the contrary rests

17  upon the party asserting jurisdiction.  <u>Kokkonen v. Guardian Life</u>

18  <u>Ins. Co. of America</u>, 511 U.S. 375, 377 (1994).  Lack of subject

19  matter jurisdiction is never waived and may be raised by either

20  party or the Court at any time.  <u>Attorneys Trust v. Videotape</u>

21  <u>Computer Prod., Inc.</u>, 93 F.3d 593, 594-95 (9th Cir. 1996).

22  ///

23  _____

24      [6] In granting Defendants' First Motions to Dismiss, the
    Court permitted Plaintiffs forty-five (45) days in which to
25  amend.  Plaintiffs' amendment on the forty-sixth (46) day was
    thus untimely.  The Court nonetheless declines any invitation to
26  dismiss Plaintiffs' FAC on this ground and will address the
    parties' substantive arguments instead.
27
        [7] All further references to "Rule" or "Rules" are to the
28  Federal Rules of Civil Procedure unless otherwise noted.

1  In moving to dismiss for lack of subject matter jurisdiction
2  pursuant to Rule 12(b)(1), the challenging party may either make
3  a facial attack on the allegations of jurisdiction contained in
4  the complaint or can instead take issue with subject matter
5  jurisdiction on a factual basis.  Thornhill Publ'g Co. v. Gen.
6  Tel. & Elec. Corp., 594 F.2d 730, 733 (9th Cir. 1979);
7  Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3rd
8  Cir. 1977).  If the motion constitutes a facial attack, the Court
9  must consider the factual allegations of the complaint to be
10 true.  Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981);
11 Mortensen, 549 F.2d at 891.  If the motion constitutes a factual
12 attack, however, "no presumptive truthfulness attaches to
13 plaintiff's allegations, and the existence of disputed material
14 facts will not preclude the trial court from evaluating for
15 itself the merits of jurisdictional claims."  Thornhill, 594 F.2d
16 at 733 (quoting Mortensen, 549 F.2d at 891).  The Court may
17 properly consider extrinsic evidence in making that
18 determination.  Velasco v. Gov't of Indon., 370 F.3d 392, 398
19 (4th Cir. 2004).

20

21      **B.  Motion to Dismiss for Failure to State a Claim Under**
22          **Rule 12(b)(6).**

23      On a motion to dismiss for failure to state a claim under
24 Rule 12(b)(6), all allegations of material fact must be accepted
25 as true and construed in the light most favorable to the
26 nonmoving party. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336,
27 337-38 (9th Cir. 1996).
28 ///

15

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the [...] claim is and the grounds upon which it rests.'" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (<u>quoting</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)).  A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require detailed factual allegations.  However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Id.</u> (internal citations and quotations omitted). A court is not required to accept as true a "legal conclusion couched as a factual allegation." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S. Ct. 1937, 1950-51 (2009) (<u>quoting</u> <u>Twombly</u>, 550 U.S. at 555).  "Factual allegations must be enough to raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555 (<u>citing</u> 5 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1216 (3d ed.2004) (stating that the pleading must contain something more than "a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.")).

Furthermore, "Rule 8(a)(2) ... requires a 'showing,' rather than a blanket assertion, of entitlement to relief." <u>Id.</u>, 550 U.S. at 556 n. 3 (internal citations and quotations omitted). Thus, "[w]ithout some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirements of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests."

1  <u>Id.</u> (<u>citing</u> 5 Charles Alan Wright & Arthur R. Miller, supra, at
2  § 1202).  A pleading must contain "only enough facts to state a
3  claim to relief that is plausible on its face."  <u>Id.</u> at 570.  If
4  the "plaintiffs ... have not nudged their claims across the line
5  from conceivable to plausible, their complaint must be dismissed."
6  <u>Id.</u>  However, "[a] well-pleaded complaint may proceed even if it
7  strikes a savvy judge that actual proof of those facts is
8  improbable, and 'that a recovery is very remote and unlikely.'"
9  <u>Id.</u> at 556 (<u>quoting</u> <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)).
10
11      **C.   Leave to Amend**
12
13      A court granting a motion to dismiss a complaint must decide
14  whether to grant leave to amend.  Leave to amend should be
15  "freely given" where there is no "undue delay, bad faith or
16  dilatory motive on the part of the movant, ... undue prejudice to
17  the opposing party by virtue of allowance of the amendment, [or]
18  futility of the amendment...."  <u>Foman v. Davis</u>, 371 U.S. 178, 182
19  (1962); <u>Eminence Capital, LLC v. Aspen, Inc.</u>, 316 F.3d 1048, 1052
20  (9th Cir. 2003) (listing the <u>Foman</u> factors as those to be
21  considered when deciding whether to grant leave to amend).  Not
22  all of these factors merit equal weight.  Rather, "the
23  consideration of prejudice to the opposing party ... carries the
24  greatest weight."  <u>Eminence Capital</u>, 316 F.3d at 1052.
25  Dismissal without leave to amend is proper only if it is clear
26  that "the complaint could not be saved by any amendment."
27  <u>Intri-Plex Techs. v. Crest Group, Inc.</u>, 499 F.3d 1048, 1056 (9th
28  Cir. 2007) (internal citations and quotations omitted).

**ANALYSIS**[8]

**A.    Individual Capacity Defendants**

Before turning to the merits of the official-capacity Defendants' current Motion, the Court notes that it is undisputed Defendants have not been served in their individual capacities. Opposition, 3:12-15; see also Stipulation to Extend Time (ECF No. 45), 2:5-6.  Pursuant to this Court's Original Order, Plaintiffs were directed to serve the individual capacity Defendants not later than ten (10) days following the date their FAC was electronically filed.  2011 WL 4566004, *28.  Accordingly, in both their current Motion and at oral argument, Plaintiffs had no choice but to concede that the individual capacity Defendants should be dismissed.  See, e.g., Opposition, 3:12-15. Plaintiffs' claims against both Defendants Clinton and Foo in their individual capacities are thus DISMISSED without leave to amend for failure to serve those Defendants in conformity with this Court's Order.[9]

_____

[8] As previously stated, Plaintiffs' Original Complaint and FAC are substantially the same.  Accordingly, to the extent applicable here, the Court incorporates by reference its entire Original Order, 2011 WL 4566004, into its current Order.  The Court will nonetheless cite to specific sections of its Original Order at various points below, thereby making clear which portions of that decision are relevant to each of the parties' current arguments.

[9] Moreover, while Plaintiffs stood by the merits of their claims against Secretary of State Clinton at the hearing before this Court, Plaintiffs were unable to rebut the fact that Secretary Clinton had not taken office at the time the events alleged in the Complaint purportedly occurred.  Even in the FAC, Plaintiffs allege only that Secretary Clinton is the "acting" Secretary of State, not that she was in office during the underlying tragedy.  FAC, ¶ 10.

1   See Fed. R. Civ. Proc. 4, 41(b); E.D. Cal. Local Rule 110.

2

3       **B.   Official Capacity Defendants**[10]

4           **1.   Plaintiff Bjorlin's Declaratory Relief Cause of Action.**[11]

5

6       Plaintiff Bjorlin alone asks this Court to issue two

7   declarations regarding the validity of CPA Order 17 and the

8   manner in which the United States handles the kidnapping of its

9   citizens by terrorists in a foreign country and/or the manner in

10  which the United States handles any subsequent negotiations with

11  those terrorists.[12]  This Court already rejected the Family

12  Plaintiffs' request that it issue essentially identical

13  declarations.  See Original Complaint, p. 15-17, ¶¶ 26(a) and

14  26(h); Original Order, 2011 WL 4566004, *5-19.

15  ///

16

17  _____

18  As difficult as it is for this Court to see how Secretary Clinton
    can be implicated in her individual capacity by events that
    occurred prior to her appointment, given the alternative grounds
19  justifying dismissal, this Court need not speculate as to whether
    Plaintiffs can actually state a claim against the Secretary of
20  State on these facts.

21      [10] The claims against Defendants in their official
    capacities are essentially claims against the United States.
22  Kentucky v. Graham, 473 U.S. 159, 165-66 (1985); Consejo de
    Desarrollo Economico de Mexicali, A.C. v. United States, 482 F.3d
23  1157, 1173 (2007); Del Raine v. Carlson, 826 F.2d 698, 703 (7th
    Cir. 1987).
24
        [11] Contrary to the Original Complaint, in which all
25  Plaintiffs sought declaratory relief, the only Plaintiff pursuing
    the Declaratory Relief cause of action via this FAC is the newly
26  added Plaintiff Bjorlin.  The Family Plaintiffs chose not to
    renew their original claim in this amended pleading.
27
        [12] It is irrelevant to this Court's decision whether the
28  kidnappers are deemed "terrorists" or "common criminals."

19

Accordingly, the United States now seeks dismissal of this cause of action again because, as before: 1) it presents nonjusticiable political questions; 2) Plaintiff Bjorlin lacks standing to seek this relief; and 3) Plaintiff Bjorlin has not alleged the imminent harm that is a necessary prerequisite to finding a case or controversy underlying the instant claim.  Defendants' arguments are well-taken.

First, Plaintiff Bjorlin has failed to allege he has standing to pursue his current declaratory relief cause of action for the same legal reasons the Family Plaintiffs lacked standing to pursue their original claims.  As the Court stated in its Original Order:

> A plaintiff bears the burden of establishing "that he has standing for each type of relief sought." Summers v. Earth Island Inst., 555 U.S. 488, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009).
>
> To show Article III standing for injunctive relief, a plaintiff must demonstrate the existence of an "imminent and actual" threat of injury that is "not conjectural and hypothetical." Id.  "Past exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects." Mayfield v. U.S., 599 F.3d 964, 970 (9th Cir.2010) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).  "Once a plaintiff has been wronged, he is entitled to injunctive relief only if he can show that he faces a 'real or immediate threat ... that he will again be wronged in a similar way.'" Id. at 970 (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)).
>
> ...
>
> Under the same logic, Plaintiffs' declaratory relief claims fail as well.  The lack of a controversy of any sufficient immediacy essentially renders Plaintiffs' claims impermissible requests for advisory opinions:

1           The federal courts established pursuant to
2           Article III of the Constitution do not render
          advisory opinions.  For adjudication of
3           constitutional issues, concrete legal issues,
          presented in actual cases, not abstractions
4           are requisite.  This is as true of
          declaratory judgments as any other field.
5           The difference between an abstract question
          and a controversy contemplated by the
6           Declaratory Judgment Act is necessarily one
          of degree, and it would be difficult, if it
7           would be possible, to fashion a precise test
          for determining in every case whether there
8           is such a controversy. Basically, the
          question in each case is whether the facts
9           alleged, under all the circumstances, show
          that there is a substantial controversy,
10          between parties having adverse legal
          interests, of sufficient immediacy an[d]
11          reality to warrant the issuance of a
          declaratory judgment.

12        Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956,
       22 L.Ed.2d 113 (1969) (internal citations and
13        quotations omitted).  As with Plaintiffs' claims for
       injunctive relief, their declaratory relief claims are
14        entirely premised on past harms and there are no
       allegations within the Complaint that Plaintiffs might
15        at some point be subject to Defendants' same policies
       and actions such that any live controversy warranting
16        future declaratory relief exists.

17 Original Order, 2011 WL 4566004, *20.

18     A review of the Complaint makes clear that Plaintiff Bjorlin

19 seeks relief for a threat that is "conjectural and hypothetical,"

20 not "imminent and actual," and that there is no "substantial

21 controversy, between parties having adverse legal interests, of

22 sufficient immediacy."  First, Plaintiff Bjorlin's standing is,

23 in some respects, even more attenuated than was the standing of

24 the Family Plaintiffs because, unlike those parties, Mr. Bjorlin

25 has not even alleged he suffered a past harm.

26 ///

27 ///

28 ///

1  To the contrary, Plaintiff Bjorlin alleges only that he

2  previously served as a contractor in Iraq, is currently

3  classified as a contractor, and that "Defendant Secretary of

4  State will foreseeably apply CPA Order 17 and/or related language

5  to Plaintiff Gary Bjorlin in the future, which negatively impacts

6  his position as a contractor." FAC, ¶¶ 29, 51.  On that basis

7  alone, Plaintiff Bjorlin would have this Court believe:

8      [I]t is foreseeable that [he] may be kidnapped or
    injured as a security contractor.  Plaintiff Gary

9      Bjorlin therefore wishes to know what, if any steps,
    the United States will take to protect him as a

10     security contractor.  Specifically, whether members of
    his family are allowed to negotiate with criminals, as

11     opposed to individuals who the United States deems to
    be "terrorists."

12

13 Id., ¶ 52.

14     What Mr. Bjorlin really seeks, then, is a declaration of his

15 rights, if he elects to serve again, if he is hired by a

16 contractor, if he is shipped overseas, if CPA Order 17 is still

17 in effect or if another similar order instead governs,[13] and,

18 with respect to the kidnapping declaration, if he is kidnapped,

19 and if he is then held hostage.  Based on this logic, almost any

20 American even contemplating serving overseas could make roughly

21 the same argument.

22 ///

23 ///

24 ///

25 ///

26 ///

27

28     [13] The Government has made clear that CPA Order 17 is no
longer in effect in Iraq.  See Motion, p. 12 n.6.

1  Mr. Bjorlin has thus failed to allege he has

2  standing to bring this claim.  <u>See</u> Original Order, 2011 WL

3  4566004, *20-21.[14]

4       Plaintiff Bjorlin (and all of the Family Plaintiffs for that

5  matter) is likewise unable to assert any form of taxpayer

6  standing to justify pursuit of his instant cause of action as

7  well.  Though Plaintiffs purport to bring the FAC "on behalf of

8  themselves as individuals and as taxpayers," FAC, p. 1, and later

9  refer to their pleading as a "Taxpayer Complaint," <u>id.</u>, p. 2,

10  this Court has already rejected reliance on taxpayer standing in

11  this context.  <u>See</u> Original Order, 2011 WL 4566004, *21 (<u>citing</u>

12  <u>Valley Forge Christian College v. Americans United for Separation</u>

13  <u>of Church and State, Inc.</u>, 454 U.S. 464, 477 (1982);

14  <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 347 (2006)).

15       Regardless, even if Mr. Bjorlin had standing to seek the

16  above declarations, this Court has already nonetheless determined

17  his requested declarations raise nonjusticiable political

18  questions.  Original Order, 2011 WL 4566004, *5-12.  While

19  Plaintiff Bjorlin has attempted to rectify the massive over-

20  breadth of the requests in the Original Complaint by narrowing

21  the relief sought here, and while he disclaims any intent to

22  challenge United States foreign policy or to embarrass the

23  Government, Mr. Bjorlin still ultimately seeks relief that this

24  Court lacks the power to grant.

25

26       [14] For this same reason, Mr. Bjorlin's claim is also not yet
   ripe.  Original Order, 2011 WL 4566004, *21 (<u>citing</u> <u>Hodgers-</u>
27  <u>Durgin v. De La Vina</u>, 199 F.3d 1037, 1044 (9th Cir. 1999)
   ("[F]ailure to establish a likelihood of future
28  injury...renders...[claims] for declaratory relief unripe.").

Moreover, Plaintiffs' intent in bringing this suit is unfortunately irrelevant to whether the questions raised in the Complaint are justiciable.  Indeed, intentions aside, Plaintiff Bjorlin still seeks the judgment of this Court regarding how the Government employs contractors overseas and how it handles kidnappings, or permits families to intervene in kidnappings, taking place amidst an international conflict in a war zone. Accordingly, for the same reasons already stated in its Original Order, Plaintiff's current Declaratory Relief cause of action is nonjusticiable as well.  Id.

Moreover, it has become clear to this Court, both upon its review of all papers filed in this action and its consideration of the parties' oral arguments, that Plaintiff Bjorlin will be unable to amend the current pleading to properly state a claim for the type of declaratory relief sought.  Accordingly, Plaintiff Bjorlin's claim for declaratory relief is DISMISSED without leave to amend.

### 2.   Plaintiffs' First Amendment Cause of Action.

By way of their First Amendment cause of action, Plaintiffs "seek an injunction against Defendants' future violations of rights to Freedom of Expression and Assembly guaranteed by the United States Constitution."  FAC, ¶ 59.  Plaintiffs also appear to seek damages as compensation for losses sustained as a result of the Government's actions.

///

///

1  Id. ("Defendants' deliberate roadblock of Plaintiffs' protected

2  right under the First Amendment of the United States

3  Constitution...has resulted in substantial losses to

4  Plaintiffs.") (emphasis added).

5       Though Plaintiffs did not expressly identify a First

6  Amendment cause of action in their Original Complaint, this Court

7  interpreted that pleading to state such a claim for injunctive

8  relief.  Original Order, 2011 WL 4566004, *9 n.5.  The Court

9  therefore previously addressed this cause of action in its prior

10 Order regarding Defendants' First Motions.  Plaintiffs have not

11 materially amended the allegations supporting this cause of

12 action in the FAC.  Accordingly, for those reasons articulated in

13 its Original Order, Plaintiffs' equitable First Amendment claim

14 once again fails.  See id., 2011 WL 4566004, *5-19, 20-21.

15      More specifically, none of the Plaintiffs have standing to

16 pursue any injunction under the First Amendment.  As in their

17 prior Complaint, the Family Plaintiffs allege only past harms

18 incapable of conferring standing in support of this type of

19 equitable claim.  Id., 2011 WL 4566004, *20-21.  In addition, as

20 discussed above with respect to Plaintiffs' declaratory relief

21 cause of action, Plaintiff Bjorlin lacks standing to pursue the

22 instant claim for the same reasons he lacked standing in that

23 context.  As stated, the likelihood of him serving overseas

24 again, let alone being kidnapped and then made to personally

25 suffer similar deprivations of his First Amendment rights at the

26 hands of the Government, is entirely speculative.

27 ///

28 ///

1    Similarly, the likelihood that any of Plaintiff Bjorlin's family

2    members, none of whom are plaintiffs here in any event, would

3    suffer any such injury is nothing more than hypothetical as well.

4         Even if Plaintiffs had standing to pursue this cause of

5    action, however, their claim would nonetheless be barred under

6    the political question doctrine for those reasons already stated

7    by the Court in its Original Order.  2011 WL 4566005, *5-19.  As

8    in their Original Complaint, Plaintiffs in their FAC once again

9    claim their First Amendment rights were violated because the

10   Government blocked Plaintiffs' distribution of flyers Plaintiffs

11   hoped would lead to information regarding Decedents' whereabouts

12   and because the Government advised Decedents' families they could

13   not meet with a fellow citizen claiming to have such information.

14   FAC, ¶ 56.  Plaintiffs thus challenge Executive Branch decisions

15   as to, among other things, "the Government's handling of

16   kidnappings overseas," decisions which are not reviewable in this

17   Court.  Original Order, 2011 WL 4566005, *9-10.  Indeed,

18   Plaintiffs here once again "seek to dictate the manner in which

19   the Government responds to the kidnapping of American citizens in

20   a foreign war zone, as well as the type and breadth of

21   information disseminated by the Government to both the families

22   of the victims and the kidnappers themselves."  Id., 2011 WL

23   4566005, *10.  Ultimately, Plaintiffs still seek to have this

24   Court "evaluate the scope of Government policies concerning

25   negotiations with 'terrorists, by official nomenclature or by any

26   other name."  Id.  This Court has already refused to do so, and

27   nothing in Plaintiffs' FAC has convinced the Court it should now

28   hold otherwise.

26

Accordingly, the Court now finds once again that Plaintiffs'
First Amendment cause of action presents a nonjusticiable
political question and thus should be dismissed.

Couching Plaintiffs' current claim as a request for damages
rather than a request for injunctive relief does nothing to
change this Court's conclusion.  Regardless of the relief sought,
rendering a decision on this cause of action would require the
Court to invade the province of the Executive Branch in no less
of an intrusive manner than do Plaintiffs' requests for
injunctive relief.  Moreover, as stated in greater detail below,
Plaintiff Bjorlin lacks standing to pursue any claim for monetary
relief. Finally, even if Plaintiffs' First Amendment cause of
action was not barred for all of the reasons just stated, this
claim would nonetheless fail because, again as discussed below,
Plaintiffs have not alleged the Government waived its sovereign
immunity.  Because this Court believes any attempt to further
amend the FAC would be futile, Plaintiffs' First Amendment cause
of action is thus DISMISSED without leave to amend.

### 3.   Plaintiffs' Procedural Due Process and Takings Causes of Action.

In their Original Complaint, Plaintiffs alleged by way of
their Procedural Due Process cause of action that the Government
had "deprived [them] of their constitutionally protected interest
in the lives of their children without due process through the
use of 'underground regulations,' 'unwritten policies,' and while
illegally retaining vendors who were improperly compensated."
Original Complaint, p. 19, ¶ 31.

1  The Court determined that claim was nonjusticiable.  Original
2  Order, 2011 WL 4566004, *5-12.  In the FAC, to the contrary,
3  while Plaintiffs again appear to allege Defendants
4  unconstitutionally deprived them of Decedents' lives without due
5  process of law, Plaintiffs now make clear that they also believe
6  Defendants are withholding the following private property to
7  which the Family Plaintiffs are entitled:  1) insurance benefits
8  in excess of $100,000 per Decedent; 2) back pay in excess of
9  $100,000 per Decedent; and 3) benefits in excess of $100,000 per
10  Decedent under the DBA, the LHWCA and the WHCA.  FAC, ¶ 61.

11      Plaintiffs' Takings cause of action is similar to their
12  newly stated Procedural Due Process claim.  For example,
13  Plaintiffs allege that "[t]o the extent that...Plaintiffs' sons'
14  labor and private benefits including insurance proceeds, were
15  converted to public use, Plaintiffs are entitled to just
16  compensation for this property."  Id., ¶ 66.  Again according to
17  Plaintiffs, the United States has improperly retained insurance
18  benefits, back payments and benefits owed under the DBA, LHWCA
19  and the WHCA.  Id.

20      Plaintiffs' Procedural Due Process claim, which the Court
21  previously found entirely barred as nonjusticiable, now therefore
22  shares some characteristics with Plaintiffs' Takings cause of
23  action, a claim this Court determined in its Original Order
24  survived political question review.  Accordingly, for those
25  reasons stated in the Court's Original Order, to the extent
26  Plaintiffs again seek to recover for the loss of Decedents'
27  lives, Plaintiffs' Procedural Due Process cause of action is
28  barred as nonjusticiable.  Order 2011, WL 456604, *5-12.

28

However, to the extent Plaintiffs' current claim arises out of
the Government's purportedly wrongful retention of benefits and
back pay, this claim, like both Plaintiffs' original and newly-
stated Takings claim, is justiciable for the reasons stated there
as well.  2011 WL 4566004, *13-16 (finding Plaintiffs' Takings
cause of action justiciable to the extent based on Defendants'
failure to compensate Decedents for work performed or to
compensate Decedents pursuant to the DBA, LHWCA and WHCA).  Both
Plaintiffs' Procedural Due Process and Takings causes of action
are nonetheless still barred in their entirety for the reasons
that follow.

　　　　First, as already discussed in great detail both in the
Court's Original Order and above here, the Family Plaintiffs lack
standing to seek injunctive relief given the lack of any
allegations in the FAC indicating they might suffer the harms
alleged at any point in the future.  2011 WL 4566004, *20-21.
Plaintiff Bjorlin likewise lacks standing to pursue an injunction
here for those reasons stated above.  Conversely, to the extent
Plaintiff Bjorlin seeks monetary relief, his claim fails because
he has not alleged he has suffered any compensable harm.  <u>See</u>
<u>Friends of the Earth, Inc. v. Laidlaw Environmental Services</u>
<u>(TOC), Inc.</u>, 528 U.S. 167, 185 (recognizing "a plaintiff must
demonstrate standing separately for each form of relief sought");
<u>see also</u> <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 105 (1983)
(comparing plaintiff's standing to pursue injunctive relief with
his standing to pursue damages).

///

///

1    Plaintiffs' claims for monetary relief likewise fail in
2  their entirety for the additional reason that Plaintiffs have not
3  alleged that the Government waived its sovereign immunity.  "The
4  basic rule of federal sovereign immunity is that the United
5  States cannot be sued at all without the consent of Congress."
6  Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S.
7  273, 287 (1983).  This sovereign immunity "applies to all federal
8  agencies and to federal employees acting within their official
9  capacities."  Hodge v. Dalton, 107 F.3d 705, 707 (9th Cir. 1997).
10 Absent a waiver of sovereign immunity, a claim against the United
11 States or a federal agency must be dismissed for lack of subject
12 matter jurisdiction.  Kaiser v. Blue Cross of California,
13 347 F.3d 1107, 1117 (9th Cir. 2003).  Any waiver of sovereign
14 immunity must be both "unequivocally expressed," Hodge, 107 F.3d
15 at 707, and "strictly construed in favor of the United States,"
16 Jerves v. United States, 966 F.2d 517, 521 (9th Cir. 1992).

17    The Court discussed Plaintiffs' failure to allege a proper
18 waiver of sovereign immunity in great detail in its Original
19 Order and that analysis remains just as applicable here.  2011 WL
20 4566004, *22-23.  More specifically, though Plaintiffs purported
21 to bring the instant causes of action pursuant to 42 U.S.C.
22 § 1983, as this Court has already found, "Section 1983 does not
23 contain a statutory waiver of the federal government's immunity
24 and thus does not provide an avenue through which Plaintiffs can
25 pursue their monetary claims."  Order, 2011 WL 4566004, *22.
26 Plaintiffs are likewise unable to pursue their claims against the
27 Government directly under the Constitution.  See Rivera v. United
28 States, 924 F.2d 948, 951 (9th Cir. 1991).

1    In addition, Plaintiffs now admit they value their monetary

2    claims to be worth in excess of $100,000 per Decedent.  See,

3    e.g., FAC, ¶¶ 36, 48, 61 and 66.  For the reasons articulated in

4    this Court's Original Order, Plaintiffs have thus pled themselves

5    out of an ability to proceed here under the Tucker Act.

6    Original Order, 2011 WL 4566004, *22 (claims seeking in excess of

7    $10,000 must be brought in the Court of Federal Claims).

8    Finally, any attempt Plaintiffs may be making to bring claims

9    under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346,

10   2671 et seq., similarly fails for those reasons already stated by

11   this Court in its Original Order.  2011 WL 4566004, *23

12   (Plaintiffs' attempt to invoke waiver under the FTCA was flawed

13   because Plaintiffs failed to allege they exhausted administrative

14   remedies and, even if a waiver could potentially be found,

15   numerous statutory exceptions to the FTCA would apply.).

16   Plaintiffs' Procedural Due Process and Takings causes of action

17   are thus subject to dismissal on this basis alone.

18        Plaintiffs' attempt to save these claims by couching them as

19   requests for equitable relief is rejected as well.  According to

20   Plaintiffs, their claims are not barred by the Government's

21   sovereign immunity because Plaintiffs do not seek damages and

22   instead merely seek the return of property and monies that belong

23   to them and that are being wrongfully held by the United States.

24   Opposition, 20:3-15 (citing Taylor v. Westly, 401 F.3d 924, 934

25   (9th Cir. 2005)); id., 21:20-21.

26   ///

27   ///

28   ///

31

1  However, Plaintiffs have not alleged that the Government, as

2  opposed to a third party, _itself_ deprived Plaintiffs of any

3  benefits, back payments or insurance proceeds without due process

4  of law, nor have Plaintiffs alleged that the Government, as

5  opposed to a third party, _itself_ took any property from

6  Plaintiffs without paying just compensation.  To the contrary,

7  Plaintiffs allege that Crescent and the Insurance Defendants

8  deprived Decedents and their families of their property and that

9  the Government is somehow responsible for those deprivations.

10 Plaintiffs thus seek to recover not their own property but monies

11 from the federal coffers.  This is precisely the type of claim to

12 which the United States is immune.[15]

13      Finally, Plaintiffs' instant claims are subject to dismissal

14 under Rule 12(b)(6) as well.  More specifically, even if

15 Plaintiffs' claims for insurance benefits or back pay were not

16 barred for the reasons just stated, those claims again fail

17 because Plaintiffs have not alleged the Government, as opposed to

18 Crescent or the Insurance Defendants, deprived them of insurance

19 benefits or back pay.  _See_ Order, 2011 WL 4566004, *23-24.

20 Indeed, while Plaintiffs allege they contracted with Crescent and

21 that Crescent in turn contracted with the Insurance Defendants,

22 nowhere do Plaintiffs allege the Government was a party to any of

23 those agreements.

24 _____

25     [15] For this same reason, Plaintiffs' attempt to cast their
   request for payment of money owed as an equitable claim seeking
26 the return of Decedents' or Plaintiffs' property also fails
   because they really seek monetary damages, which do not generally
27 constitute irreparable harm.  _See_ Original Order, 2011 WL
   4566004, *21 and n.13 (_citing_ Goldie's Bookstore, Inc. v.
28 Superior Court of State of Cal., 739 F.2d 466, 471 (9th Cir.
   1984)).

                                    32

1  Plaintiffs' conclusory assertions that the Government "oversaw"
2  those agreements or created an "authorized" list of Contractors
3  are insufficient to properly link the Government to the
4  underlying contracts, even through the generous lens prescribed
5  by Rule 12(b)(6).

6      Plaintiffs' attempt to assert an entitlement to benefits
7  under the LHWCA, the DBA and the WHCA likewise fails.  First,
8  Plaintiffs have not exhausted their administrative remedies under
9  the LHWCA and the DBA in the Department of Labor.  See Bish v.
10 Brady-Hamilton Stevedoring, 880 F.2d 1135, 1137 (9th Cir. 1989).
11 Moreover, even if Plaintiffs had alleged they exhausted their
12 claims, review of any final agency decision would be not in this
13 Court but in the Ninth Circuit.  Pearce v. Dir., Office of
14 Workers' Comp. Programs, 603 F.2d 763, 771 & n.2 (9th Cir. 1979).
15 Likewise, any decision as to compensation under the WHCA is
16 rendered by the Secretary of the Department of Labor, whose
17 decision is "final and conclusive."  See 42 U.S.C. §§ 1701(a),
18 1715; 20 C.F.R. §§ 61.1 et seq.  Given the above authorities,
19 Plaintiffs apparently now concede that their workers'
20 compensation claims are insufficient.  See, e.g., Opposition,
21 21:20-26 ("Plaintiffs seek contract payments and insurance
22 proceeds that clearly not subject to workers compensation
23 laws....[T]hese are not the Plaintiffs' claims in the amended
24 complaint.").  Accordingly, Plaintiffs' Procedural Due Process
25 and Takings causes of action, like their Declaratory Relief and
26 First Amendment causes of action, are dismissed without leave to
27 amend.
28 ///

33

**CONCLUSION**

For all of the reasons stated herein, Defendants' Motion to Dismiss (ECF No. 46) is GRANTED without leave to amend. This action will, however, proceed on Plaintiffs' remaining claims against the Insurance Defendants.

IT IS SO ORDERED.

Dated: March 27, 2012

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

34